Anita Y. Milanovich (MSB #12176)
Rachel K. Meredith (MSB #11552)
Office of the Governor
1301 E. 6th Avenue
PO Box 200801
Helena, MT 59620-0801
Phone: (406) 444-5503
Email: anita.milanovich@mt.gov
        rachel.meredith@mt.gov
*Counsel for Plaintiff*

Lindsey Simon (MSB #34338757)
Legal Counsel
Montana Department of Livestock
PO Box 202001
Helena, MT 59620-2001
Phone: (406) 444-7631
Email: lindsey.simon3@mt.gov
*Counsel for Plaintiff*

Jeff Hindoien (MSB #4101)
Chief Legal Counsel
Kevin Rechkoff (MSB #54137140)
Montana Department of Fish, Wildlife
and Parks
PO Box 200701
Helena, MT 59620-0701
Phone: (406) 444-4047
Email: jeff.hindoien@mt.gov
        kevin.rechkoff@mt.gov
*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| STATE OF MONTANA, BY AND THROUGH ITS GOVERNOR, MONTANA DEPARTMENT OF LIVESTOCK, AND MONTANA DEPARTMENT OF FISH, WILDLIFE AND PARKS,<br><br>    Plaintiff,<br><br>    v.<br><br>DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior; THE UNITED STATES DEPARTMENT OF THE INTERIOR; CHARLES F. SAMS III, in his official capacity as Director of the National Park | Civ. No. CV-24-180-BLG-TJC<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Service; THE NATIONAL PARK SERVICE,
an agency of the United States Department of
the Interior; and CAM SHOLLY, in his
official capacity as Superintendent of
Yellowstone National Park,

Defendants.

Plaintiff State of Montana, by and through its Governor, Montana Department

of Livestock (MDOL), and Montana Department of Fish, Wildlife and Parks (MFWP)

(collectively, State, Montana, or Plaintiff) hereby allege as follows:

## INTRODUCTION

1.      The population size of Yellowstone National Park's (YNP) bison herd

has been a source of constant strife for the National Park Service (NPS) and YNP's

neighbors, including Montana. In the park's early days, the federal government strove

to bolster and grow the population. In the 1920s, as the population tipped 700, the

United States Department of the Interior (DOI) began grappling with how to manage

the herd at a size commensurate to available range. With the adoption of its "natural

regulation" philosophy in the 1960s, YNP threw active herd management to the wind.

The bison population boomed, spilling brucellosis-infected bison into Montana and

forcing the State to pick up YNP's slack in order to protect its livestock industry from

the disease.

2.      The product of litigation, YNP and Montana adopted bison management

plans in 2000. These plans identified a population target for the herd (3,000) and set

forth a series of actions each entity would take to manage the population and spread of brucellosis. Over the last 20 years, YNP has utterly failed to manage to the specified population target or implement critical elements of its plan.

3.    In an effort to cover its inability to manage bison pursuant to the 2000 plan, YNP adopted a new Bison Management Plan (BMP) in 2024. This new plan's adoption fails to comply with the National Environmental Policy Act (NEPA) and is a violation of the National Park Service Organic Act (NPSOA) and Yellowstone National Park Protection Act (YNPPA). Critically, it was developed without meaningful consultation and collaboration with one of its "cooperating agencies"…the State of Montana.

4.    The new BMP is another example of YNP's tendency to do what it wants, leaving Montana to collect the pieces. While this history has played out for decades, with Montana dutifully playing its role, this particular "plan" is NEPA deficient and creates significant harm to YNP resources, particularly its vegetation and range resources. For these reasons, its adoption is arbitrary and capricious and a violation of the law.

## JURISDICTION AND VENUE

5.    Jurisdiction is proper under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including NEPA, 42 U.S.C. §§ 4321 *et seq.*; the Administrative Procedures Act (APA), 5 U.S.C. §§ 701 *et seq.*; the

NPSOA, 54 U.S.C. §§ 100101 *et seq.*; the YNPPA, 16 U.S.C. §§ 21 *et seq.*; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

6.     Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to the claims herein occurred within this judicial district, Defendants are located in the district, and the affected public lands and resources and agency records in question are located, at least partially, in this judicial district.

7.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

8.     The BMP is a final agency action that is judicially reviewable under the APA. 5 U.S.C. §§ 704, 706.

## **PARTIES**

9.     Plaintiff State of Montana is a sovereign state of the United States.

10.     As governor of the State of Montana, Plaintiff GREG GIANFORTE is the "sole official organ of communication between the government of this state and the government of…the United States." Mont. Code Ann. § 2-15-201(3). As governor, he is vested with the executive power and "shall see that the laws are faithfully executed." Mont. Const. art. VI, § 4(1). He is "the chief executive officer of

the state," tasked with "formulat[ing] and administer[ing] the policies of the executive branch of state government." Mont. Code Ann. § 2-15-103. He "has full power [to] supervis[e], approv[e], direct[ ], and appoint" all departments and their units, and "shall…supervise the official conduct of all executive and ministerial officers…." Mont. Code Ann. §§ 2-15-103, 2-15-201(a).

11.    Plaintiff MDOL shall "exercise general supervision over and, so far as possible, protect the livestock interests of the state from theft and disease…." Mont. Code Ann. § 81-1-102(1). To this end, MDOL oversees testing and vaccination, branding and identification, and containment requirements for Montana livestock. *See generally* Mont. Code Ann. §§ 81-1-101, *et seq*. MDOL also oversees wild buffalo or bison from herds infected with dangerous disease that enter the State of Montana on public or private land. Mont. Code Ann. § 81-2-120.

12.    Plaintiff MFWP "shall supervise all the wildlife, fish, game, game and nongame birds, waterfowl, and the game and fur-bearing animals of the state." Mont. Code Ann. § 87-1-201(1). "[T]he department shall enforce all the laws of the state regarding the protection, preservation, and propagation of fish, game, fur-bearing animals, and game and nongame birds within the state." Mont. Code Ann. § 87-1-201(2). MFWP cooperates with MDOL in managing wild buffalo or bison from herds infected with dangerous disease, pursuant to a plan approved by the governor. Mont. Code Ann. §§ 81-2-120(1)(d) and 87-1-216(1)(c). MFWP may

authorize public hunting of said bison pursuant to agreement and authorization by MDOL. *Id.*; Mont. Code Ann. § 87-2-730.

13.    Defendant DOI is an executive branch department of the United States, charged with managing public lands and resources, including those at issue in this action, in accordance with federal law and regulation. This responsibility includes providing oversight and direction to its agencies in their implementation of federal law and regulation.

14.    Defendant DEB HAALAND is the Secretary of DOI and has the statutory authority and responsibility to comply with federal law in the management of the federal public lands at issue in this litigation. Defendant Haaland is sued in her official capacity.

15.    Defendant NPS is an agency or instrumentality of the United States, situated within DOI, and is charged with administering YNP, in accordance with NEPA, APA, NPSOA, YNPPA, and other applicable laws.

16.    Defendant CHARLES SAMS III is the Director of NPS. Defendant Sams exercises supervisory authority over YNP and is directly responsible for implementing the laws challenged herein. Defendant Sams is sued in his official capacity.

17.    Defendant CAM SHOLLY is the Superintendent of YNP. Defendant Sholly is charged with overseeing YNP management in accordance with federal law.

Defendant Sholly is sued in his official capacity.

## FACTUAL BACKGROUND

### A.    History of YNP Bison

18.    By the early 1900s, the YNP bison herd had dwindled to 23 bison. To prevent extinction, the federal government imported 21 bison from two captive herds in Texas and Montana. Initially, these "tame" and "wild" herds were kept separate. *W. Watersheds Project (WWP) v. Salazar*, 766 F. Supp. 2d 1095, 1101 (D.C. Mont. 2011), aff'd in 494 Fed. Appx. 740 (9th Cir. 2012). As herds grew, DOI donated surplus bison to other institutions to reduce the economic burden of managing the bison. *Id.* In 1923, when the population had reached approximately 700, DOI sought Congressional authorization to sell surplus bison to private citizens. *Id.* At 700 bison, NPS was already concerned that the bison population was exceeding what the YNP range could accommodate. The NPS director explained that

> [n]otwithstanding the fact that practically every request for buffalo coming from a public institution has been granted, the demand from this source is too limited to have any appreciable effect in keeping the herd to such a size that it can be accommodated *on the range that is available*.

*Id.* at 1101–02 (citation omitted) (emphasis in original). In response, Congress enacted 16 U.S.C. § 36, allowing NPS to "sell or otherwise dispose" of surplus YNP bison. *Id.* at 1102.

19.     Despite this authority to dispose of surplus bison, the YNP bison herd tripled in size over the subsequent decades. The "tame" and "wild" herds intermingled and cross-bred, and NPS actively culled, fed, and animal-husbanded its bison. *Id.* at 1102. By 1954, the population of the northern YNP bison herd alone was 1,500. YNP conducted active herd reduction and, in 1967, the entire herd had been reduced to 397 animals. *Fund for Animals, Inc. v. Lujan*, 794 F. Supp. 1015, 1018 (D. Mont. 1991), aff'd in 962 F.2d 1391 (9th Cir. 1992).

20.     In 1969, NPS ceased its bison ranching program, implementing a "new philosophy of natural regulation." *WWP,* 766 F. Supp. 2d at 1102.

> Without appreciable pressure from natural predators and with abundant forage in Yellowstone Park, however, this largely man-made herd now began to grow exponentially, and with this growth came problems and controversy. Increasingly, this large Yellowstone bison herd began to exceed the forage available within the Park on a seasonal basis.

*Id.* While NPS began a program of boundary protection in 1968, shooting bison approaching the park boundary, that program was ultimately discontinued. *Greater Yellowstone Coalition (GYC) v. Babbitt*, 952 F. Supp. 1435, 1438 (D.C. Mont. 1996), aff'd in 1997 U.S.App. LEXIS 5158 (9th Cir. 1997) (unpublished).

21.     By 1988, the herd had reached 2,800 bison. *Fund*, 794 F. Supp. at 1018. In the 1980s and 1990s, these bison began to migrate into Montana, causing property damage, presenting safety issues, and threatening livestock and humans with the

contagious disease brucellosis. *WWP,* 766 F. Supp. 2d at 1103. Brucellosis causes fetal abortion and sterility in livestock and "undulant fever" in humans. *Id.*

22.    In 1985, Montana achieved status as a "brucellosis-free state" from the United States Department of Agriculture's Animal and Plant Health Inspection Service (APHIS) after 30 years of effort and significant financial expenditure ($30 million). *Fund*, 794 F. Supp. at 1019. This status directly affects the ability of Montana's livestock producers to ship cattle to other states and countries. *Fund*, 962 F.2d at 1401–02. In 1988, 54% of YNP bison tested positive for brucellosis. *Fund,* 794 F. Supp. at 1019. More recent surveys suggest that roughly 60% of YNP bison are seropositive. National Academies of Science, Engineering, and Medicine*, Revisiting Brucellosis in the Greater Yellowstone Area*, 10 (2020).

23.    Since at least the early 1980s, YNP bison management has been a point of contention between Montana and the federal government due to the risk of brucellosis transmission. In 1988, when the YNP bison herd reached a population of 2,800 and excess were spilling into Montana, the State instituted a damage control hunt, taking 569 bison between 1988-1989. *Fund*, 794 F. Supp. at 1018. By 1992 and 1995, the bison population had again rebounded to 3,400 and 3,900, respectively. *GYC*, 952 F. Supp. at 1438. Several interim plans were entered into by Montana and NPS. The "1992 Interim Plan essentially required Montana to manage the

Yellowstone herd for NPS by culling some 450 bison from the herd each winter, as these bison enter[ed] the State of Montana." *Id.* at 1439.

24.    In 1995, because of YNP's failure to manage its diseased bison, the influx of diseased bison into Montana, and the threat that APHIS would "downgrade" Montana's brucellosis-free status, Montana filed suit against DOI and APHIS. *Montana, et al. v. U.S., et al.*, 6:95-cv-00006-CCL-RMH. As a product of that lawsuit and extensive mediation with the State, NPS, the U.S. Forest Service (USFS), and APHIS released a Final Environmental Impact Statement (FEIS) and record of decision (ROD) for a bison management plan in 2000 (hereinafter referred to as 2000 ROD). Montana also issued a ROD the same year, which mirrored the federal ROD in many respects.

## B.    The 2000 ROD and Subsequent "Adaptive Management" Adjustments

25.    The alternative implemented by the 2000 ROD provided that a specific number of disease seronegative[1] bison would be tolerated in specific, demarcated zones north and west of YNP, during specific times of the year. 2000 ROD at 21–35. Through adaptive management,[2] agencies could tolerate as many as 100 seronegative

---

[1] The 2000 federal FEIS defined "seronegative" as "an animal with no detectable antibody in blood serum." FEIS at 804. "Seropositive" is "an animal with a detectable antibody titre in blood serum." *Id.*

[2] "In the context of the bison management plan and the modified preferred alternative, adaptive management means testing and validating with generally accepted scientific and management principles the proposed spatial and temporal separation risk management and other management actions. Under the adaptive management approach, future management actions could be adjusted, based on feedback from implementation of the proposed risk management actions." 2000 ROD at 22.

bison in Zone 2 west of YNP, *see* Fig. A, with all bison hazed back to YNP by May 15 of each year. *Id.* at 22–27.



Figure A. Bison tolerance zones north and west of YNP, as set forth in the 2000 ROD at 7.

26.     Similarly, as many as 100 seronegative bison would be tolerated in Zone 2 north of YNP, *see* Fig. A, with all bison hazed back to YNP by April 15 of each year. *Id.* at 27–31. Untested bison would be tolerated year-round in the "Eagle Creek" area north of YNP, and in the Cabin Creek Recreation and Wildlife Management Area and the Monument Mountain Unit of the Lee Metcalf Wilderness west of YNP. *Id.* at 11.

27.     The 2000 ROD also stated that on both the west and north sides of YNP, bison would be vaccinated against brucellosis. *Id.* at 10–13, 22–31. Specifically, NPS would "make every attempt" to capture and test bison leaving the park, vaccinating those seronegative animals with a safe vaccine (as determined by the agencies and pursuant to a set of criteria incorporated into the plan). *Id.* The federal agencies would also implement a remote vaccination program within the park once a safe and effective remote delivery method was available. *Id.* Only then, after remote delivery was implemented within YNP, would untested bison be allowed outside YNP boundaries.[3] *Id.* at 26–27, 30.

28.     Both the 2000 ROD and Montana's 2000 ROD stated that if, after YNP initiated an in-park vaccination program, it was terminated or deemed inadequate by Montana, Montana would cease tolerating untested bison outside YNP. *Id.* at 34; 2000 State ROD at 14.

---

[3] An exception to this provision was Eagle Creek, in which untested bison were allowed regardless of whether a remote delivery program had been implemented. 2000 ROD at 31.

29.    The 2000 ROD also stated that "[a]s an additional risk management measure, the agencies would maintain a population target for the whole herd of 3,000 bison." 2000 ROD at 20. This number was based on a 1998 National Academy of Sciences report indicating that when the population exceeds 3,000, "bison are most likely to respond to heavy snow or ice by attempting to migrate to the lower elevation lands outside the park in the western and northern boundary areas." *Id.* The population target was intended to mitigate against incursions into Montana.

30.    Pursuant to the 2000 ROD, no bison would be tolerated in Zone 3, either west or north of YNP, at any point in time. Fig. A; 2000 ROD at 21–34. Pursuant to the plan, hazing and lethal removal would be utilized to achieve zone containment. *Id.*

31.    Since 2000, NPS, APHIS, USFS, MDOL, and MFWP have met annually at what have come to be known as "Interagency Bison Management Plan" or "IBMP" meetings. During these meetings, the agencies review the previous year's management and discuss respective plans for the upcoming year. Other partners have been added to the group over the years, namely the Nez Perce Tribe, Intertribal Buffalo Council, and Confederated Salish and Kootenai Tribes.

32.    Since 2000, a number of research efforts have occurred. There have also been several actions taken to fulfill the 2000 ROD and Montana's 2000 ROD, or

"adjust" those RODs. Some of the more critical studies, actions, and adjustments are as follows:

- In 2004, MFWP and APHIS initiated research on the feasibility of a quarantine program. The program would hold seronegative bison for a designated period of time, incorporating periodic testing and removal of animals "seroconverting" and testing positive. *Preliminary Environmental Assessment—Feasibility Study of Bison Quarantine—Phase I*, MFWP (Oct. 2004).

- In 2004 and 2007, state and tribal hunting harvest began on the landscape outside YNP. *Decision Notice—Bison Hunting*, MFWP, MDOL (2004).

- In 2006, IBMP partners agreed that bull bison could remain outside YNP from November 1 to May 15 if deemed a low disease risk and no threat to public safety or property. *Adjustments to 2006-2007 IBMP Operating Procedures* (Nov. 20, 2006). IBMP partners also decided that, for that year, "a population size of 3,000 bison" would be "defined as a population indicator to guide implementation of risk management activities, and [would not be] a target for deliberate population adjustment." *Id.* This population provision is unique to the 2006-2007 operating procedures and does not appear in any subsequent procedures.

- In 2008, MFWP entered into a 30-year grazing restriction and bison access agreement with the Royal Teton Ranch (RTR) to increase available bison habitat north of YNP. *Royal Teton Ranch Grazing Restriction Environmental Assessment Decision Notice*, MFWP (Dec. 2008); Fig. A.

- In 2008, IBMP partners moved the "haze back" date for bison north of YNP from April 15 to May 1. *Adaptive Adjustments to the IBMP* (Dec. 17, 2008).

- In 2009, MFWP evaluated the translocation of quarantine graduates pursuant to the Montana Environmental Policy Act (MEPA). As a product of this effort, 88 bison were placed with the Green Ranch near Ennis, Montana. *Bison Translocation, Bison Quarantine Phase IV Environmental Assessment, Decision Notice*, MFWP (Feb. 2010).

- In 2010, NPS released a draft EIS (DEIS) examining a brucellosis remote vaccination program for YNP bison. *Brucellosis Remote Vaccination Program for Bison in YNP (Vaccination DEIS),* NPS (Mar. 2010). The DEIS noted that the vaccine RB-51 met the safety criteria of the 2000 ROD. *Id.* at 6. Accordingly, three alternatives were evaluated. The "no action" alternative described "the current hand vaccination program" which "sporadically" administered RB 51 to calves and yearlings at the Stephens Creek capture facility. *Id.* at viii. The second alternative included a combination of the existing program and a remote vaccination strategy that focused exclusively on

young, non-pregnant bison (both sexes). *Id.* The third alternative was similar to

the second, but included vaccination of adult females. *Id.* The DEIS noted that

> [t]he negotiated settlement (*i.e.,* IBMP) between the [NPS] and
> [Montana] recognized that cooperative management of bison
> was necessary since no agency has sole jurisdiction for bison
> throughout the conservation area. The IBMP noted that the NPS
> would implement an in-park vaccination program for bison and,
> in turn, [Montana] would be more flexible in allowing an
> expansion of the conservation area to include the Horse Butte
> peninsula west of [YNP] and the Gardiner Basin to the north.

*Id.* at 15.

• In 2011, the northern tolerance zone was expanded, allowing bison to access

significantly more habitat north of the YNP boundary and south of Yankee Jim

Canyon in Montana. *See, Adaptive Management Adjustments to the IBMP*

(Mar. 31, 2011) and Fig. B.



Figure B. Expanded tolerance zone (red) north of YNP, created by *Adaptive Management Adjustments to IBMP* (Mar. 31, 2011), 3.

- In 2014, NPS released a FEIS and ROD on implementing a remote vaccination program to reduce the prevalence of brucellosis in YNP bison. *Remote Vaccination Program to Reduce the Prevalence of Brucellosis in Yellowstone Bison FEIS,* NPS (Jan. 15, 2014); *Remote Vaccination Program to Reduce the Prevalence of Brucellosis in Yellowstone Bison ROD (Vaccination ROD),* NPS (Mar. 3, 2014). NPS chose the "no action" alternative, declining to implement a remote delivery program for bison vaccination. *Vaccination ROD* at 5.

- In 2015, the State of Montana issued a decision notice significantly expanding the tolerance zone west of YNP, creating year-round habitat for male and female bison west of YNP, in Montana. *Decision Notice: Year-round Habitat for Yellowstone Bison Environmental Assessment (2015 Expansion Decision)*, 6-10 (Nov. 2015); Fig. C; *Erratum Decision Notice Year-round Habitat for Yellowstone Bison Environmental Assessment* (June 2016). That same decision notice created year-round access for bull bison in the tolerance zone north of YNP, instituted in 2011. *Id.*; Fig. B.

33.    The *2015 Expansion Decision* was intended to maintain a wild, free-ranging bison population, reduce the risk of brucellosis transmission from bison to cattle and **manage other conflicts**, provide greater hunting opportunities, **expand opportunity for remote vaccination of bison for brucellosis**, and increase IBMP partner knowledge. *2015 Expansion Decision* at 5. Critically, Montana's 2015

tolerance expansion **was a spatial expansion only**, and did not create tolerance for increased population levels. In fact, the decision notice stated, multiple times, that even though the physical tolerance zone was increasing, the population target would remain unchanged at 3,000. *Id.* at 14, 24, 25.



Figure C. Bison management area/year-round tolerance zone west of YNP, as created in 2015 by *2015 Expansion Decision*, 7.

- In 2016, YNP released an environmental assessment for *The Use of Quarantine to Identify Brucellosis-free Yellowstone Bison for Relocation Elsewhere*, *(Quarantine EA),* NPS, (Jan. 14, 2016). The *Quarantine EA* analyzed impacts associated with the creation of expanded quarantine facilities and/or operations for eventual transfer of bison to public or tribal lands in Montana. Alternatives analyzed included annual captures totaling between 50 to 150 bison, depending on migration from YNP.

- In 2018, YNP issued its Finding of No Significant Impact (FONSI) for its 2016 *Quarantine EA*. YNP concluded that existing facilities could accommodate additional bison for quarantine with eventual transfer. The FONSI stated that:

  > The only difference between current management and the Selected Action is an increased likelihood of injury to bison due to longer confinement of bison in quarantine facilities. Overall, the Selected Action will reduce the number of bison shipped to slaughter, while not fundamentally changing the character or nature of the ongoing adverse impacts related to bison management. Under the Selected Action, quarantine operations will not harm the integrity of cultural or natural resources, or values, in [YNP], Montana, or on the Fort Peck Reservation.

  *FONSI,* 5–6 (May 14, 2018). The FONSI also referenced an MFWP environmental assessment which concluded that transferred, brucellosis-free YNP bison would not affect farming and ranching operations near or adjacent to the Fort Peck Reservation. However, neither the *Quarantine EA* or the FONSI analyze or discuss impacts associated with transfer of bison to other

reservations or specific public land parcels. Additionally, the analyses only reviewed bison transfers between 50 and 150 annually. Following the FONSI's issuance, YNP began implementing its Bison Conservation Transfer Program (BCTP).

## C.    Bison Population Expansion Since 2000

34.    Bison populations remained within view of the target range in 2000 and 2001, after adoption of the 2000 ROD, but have expanded ever since. Fig. D. In 2000-2001, the population was 2,708. *Id.* By 2022, the population was 5,394, peaking at 5,459 in 2016-2017. *Id.* As of October 2024, YNP was reporting a post-calving population of 5,449 +/- 335 animals. Chris Geremia, *Status Rpt. on the Yellowstone Bison Population to the Superintendent* (Sept. 30, 2024).

35.    The table below depicts YNP bison population counts completed from 1984-2022, as well as the number of bison removed, either for quarantine purposes or by harvest.

| Winter | Maximum No. Bison Counted Previous June-August[h] | | | Sent to Slaughter/Management Culls | | Hunter Harvest[a] | | Sent to Quarantine Research | | Total | Age and Gender Composition of Culls/Harvests | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | North | Central | Total | N | W | N | W | N | W | | M | F | C | Unk |
| 1970-84 | | | | 0 | 0 | 13 | 0 | 0 | 0 | 13 | 4 | 7 | 0 | 2 |
| 1984-85 | 695 | 1,552 | 2,247 | 0 | 0 | 88 | 0 | 0 | 0 | 88 | 42 | 37 | 8 | 1 |
| 1985-86 | 742 | 1,609 | 2,351 | 0 | 0 | 41 | 16 | 0 | 0 | 57 | 42 | 15 | 0 | 0 |
| 1986-87 | 998 | 1,778 | 2,776 | 0 | 0 | 0 | 7 | 0 | 0 | 7 | 5 | 2 | 0 | 0 |
| 1987-88 | 940 | 2,036 | 2,976 | 0 | 0 | 2 | 37 | 0 | 0 | 39 | 27 | 7 | 0 | 5 |
| 1988-89 | 1,058[h] | 2,089[h] | 3,147[h] | 0 | 0 | 567 | 2 | 0 | 0 | 569 | 295 | 221 | 53 | 0 |
| 1989-90 | 432[h] | 2,075[h] | 2,507[h] | 0 | 0 | 1 | 3 | 0 | 0 | 4 | 0 | 0 | 0 | 4 |
| 1990-91 | 818 | 2,203 | 3,021 | 0 | 0 | 0 | 14 | 0 | 0 | 14 | 0 | 0 | 0 | 14 |
| 1991-92 | 822 | 2,290 | 3,112 | 249 | 22 | 0 | 0 | 0 | 0 | 271 | 113 | 95 | 41 | 22 |
| 1992-93 | 681 | 2,676 | 3,357 | 0 | 79 | 0 | 0 | 0 | 0 | 79 | 9 | 8 | 9 | 53 |
| 1993-94 | 636[h] | 2693[h] | 3329[h] | 0 | 5 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 5 |
| 1994-95 | 1,140 | 2,974 | 4,114 | 307 | 119 | 0 | 0 | 0 | 0 | 426 | 77 | 66 | 31 | 252 |
| 1995-96 | 866 | 3,062 | 3,928 | 26 | 344 | 0 | 0 | 0 | 0 | 370[c] | 100 | 71 | 10 | 189 |
| 1996-97 | 860[h] | 2,724[h] | 3,584[h] | 725 | 358 | 0 | 0 | 0 | 0 | 1,083[d] | 329 | 330 | 144 | 280 |
| 1997-98 | 455 | 1,715 | 2,170 | 0 | 11 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 11 |
| 1998-99 | 489[h] | 1,622[h] | 2,111[h] | 0 | 94 | 0 | 0 | 0 | 0 | 94 | 44 | 49 | 1 | 0 |
| 1999-00 | 540 | 1,904 | 2,444 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2000-01 | 590[h] | 2,118[h] | 2,708[h] | 0 | 6 | 0 | 0 | 0 | 0 | 6 | 6 | 0 | 0 | 0 |
| 2001-02 | 719 | 2,564 | 3,283 | 0 | 202 | 0 | 0 | 0 | 0 | 202 | 60 | 42 | 16 | 84 |
| 2002-03 | 805[h] | 3,240[h] | 4,045 | 231 | 13 | 0 | 0 | 0 | 0 | 244 | 75 | 98 | 43 | 28 |
| 2003-04 | 888 | 2,923 | 3,811 | 267 | 15 | 0 | 0 | 0 | 0 | 282 | 58 | 179 | 23 | 22 |
| 2004-05 | 876 | 3,339 | 4,215 | 1 | 96 | 0 | 0 | 0 | 17 | 114 | 23 | 54 | 20 | 17 |
| 2005-06 | 1,484 | 3,531 | 5,015 | 861 | 56 | 32 | 8 | 87 | 0 | 1,044 | 205 | 513 | 245 | 81 |
| 2006-07 | 1,377 | 2,512 | 3,889 | 0 | 4 | 47 | 12 | 0 | 0 | 63 | 53 | 6 | 0 | 4 |
| 2007-08 | 2,070 | 2,624 | 4,694 | 1,288 | 160 | 59 | 107 | 112 | 0 | 1,726 | 516 | 632 | 332 | 246 |
| 2008-09 | 1,500 | 1,469 | 2,969 | 0 | 4 | 1 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 |
| 2009-10 | 1,837[h] | 1,464[h] | 3,301[h] | 3 | 0 | 4 | 0 | 0 | 0 | 7 | 7 | 0 | 0 | 0 |
| 2010-11 | 2,246[h] | 1,652[h] | 3,898[h] | 6 | 0 | Unk | Unk | 53 | 0 | 260 | 106 | 102 | 52 | 0 |
| 2011-12 | 2,314 | 1,406 | 3,720 | 0 | 0 | 15 | 13 | 0 | 0 | 28[e] | 14 | 12 | 2 | 0 |
| 2012-13 | 2,669 | 1,561 | 4,230 | 0 | 0 | 148 | 81 | 0 | 0 | 250[f] | 116 | 85 | 28 | 0 |
| 2013-14 | 3,420 | 1,504 | 4,924 | 258 | 0 | 258 | 69 | 60 | 0 | 645[g] | 202 | 287 | 152 | 4 |
| 2014-15 | 3,424[h] | 1441[h] | 4,865 | 511 | 0 | 201 | 18 | 7 | 0 | 737 | 276 | 297 | 161 | 3 |
| 2015-16 | 3,627[h] | 1,282[h] | 4,910[h] | 101 | 0 | 378 | 24 | 49 | 0 | 552 | 175 | 227 | 146 | 4 |
| 2016-17 | 4,008 | 1,451 | 5,459 | 753 | 0 | 389 | 97 | 35 | 0 | 1,274 | 311 | 585 | 342 | 36 |
| 2017-18 | 3,969 | 847 | 4,816 | 697 | 0 | 285 | 90 | 99 | 0 | 1,171 | 300 | 491 | 288 | 92 |
| 2018-19 | 3,337 | 1,190 | 4,527 | 348 | 0 | 109 | 3 | 0 | 0 | 460 | 97 | 159 | 204 | 0 |
| 2019-20 | 3,667 | 1,162 | 4,829 | 445 | 0 | 221 | 63 | 105 | 0 | 834 | 180 | 328 | 193 | 133 |
| 2020-21 | 3,427 | 1,243 | 4,670 | 0 | 0 | 153 | 34 | 0 | 0 | 187 | 64 | 57 | 42 | 24 |
| 2021-22 | 3,830 | 1,564 | 5,394 | 27 | 0 | 6 | 7 | 10 | 0 | 50 | 15 | 29 | 6 | 0 |

[a] Total includes bison harvested by game wardens and State of Montana hunters during 1973 through 1991, and state and tribal hunters after 2000.

[c] The Final Environmental Impact Statement reported 433 bison, but records maintained by Yellowstone National Park only indicate 370 bison.

[d] Total does not include an unknown number of bison captured at the north boundary and consigned to a research facility at Texas A&M University (about 100 bison).

[e] There is a report of 29 removals with differences owing to reported harvests.

[f] There is a report of 260 removals with differences owing to reported harvests.

[g] There is a report of 650 removals with differences owing to reported harvests.

[h] We reevaluated flight totals during summer 2017 using updated count areas for each herd and including flights occurring June 1-August 31.

Figure D: Excerpt from Chris Geremia, *Status Report on the Yellowstone Bison Population to the Superintendent* (Sept. 29, 2022).

**D.    Landscape Impacts of YNP Bison**

36.    The native wolf population in the YNP area was extirpated by the 1920s. In the reduction and absence of predation and hunting pressures, the YNP elk population grew considerably. Although multiple studies in the first half of the twentieth century noted decreased recruitment and suppression of height in woody plants such as aspen, cottonwood, and willow caused by elk grazing and browsing, NPS discontinued elk removal efforts in 1968 due to unpopularity, and by the late 1980s/early 1990s, the YNP elk population had reached nearly 20,000. Concerns about degradation in YNP persisted as the elk population grew. The grasslands and sagebrush steppe of the northern range provides nearly all of the foraging for YNP ungulates.

37.    Since 1920, tree-sized aspen recruitment in the northern range has been "almost nonexistent" due to intense elk browsing. Riparian areas in the northern range receiving heavy ungulate winter use show signs of degradation, such as stunted and short-stature woody vegetation, and poor cottonwood recruitment. Ungulate use appears to be the primary factor for the degradation of existing woody vegetation and preclusion of seedling recruitment.

38.    In 1995-1996, NPS reintroduced gray wolves. Bison are less susceptible to wolf predation than elk, and since reintroduction, there has been a substantial increase in the bison population and a concomitant decrease in the elk population

within YNP. Bison have been the dominant large herbivore in YNP for well over a decade.

39.     Bison and elk use the northern range differently. Bison remain in the northern range year-round, whereas elk use is typically from late fall to early spring. This means bison are foraging on growing plants earlier in the season, when they are most vulnerable to high levels of herbivory. It is estimated that the foraging needs of bison on the northern range are ten times that of elk. While deciduous woody plant recovery has been noted in some areas of the park since wolf reintroduction, degradation continues in the parts of the northern range heavily used by bison. Bison browse young plants like elk, and they also have adverse, non-consumptive effects on woody vegetation. They can kill trees by rubbing and horning and break saplings by trampling. One study concluded that "a greatly increased bison herd since 2004 is now suppressing the growth of many young aspen, willows, and cottonwoods and perhaps other plant species along the Lamar Valley."

40.     Vegetation loss, due to bison, is particularly significant in riparian areas where losses have continued as the bison population increases. Riparian areas provide more habitat for wildlife species than any other habitat type, and the rooted vegetation stabilizes streambeds and combats hydrologic erosion. The degradation of riparian plant communities in the Lamar Valley has likely contributed to a 30% decrease in sinuosity and ensures accelerated bank erosion and channel widening. Riparian plant

loss in areas of high bison use removes plant cover and results in warmer microclimates and lower soil water holding capacity. As succinctly stated in one study,

> [i]ncreased bison numbers over the last two decades appear to have come at a major ecological cost to the biological diversity and functioning of the riparian ecosystems in the Lamar Valley. Even to a casual observer there are clear indicators of highly altered ecological conditions across the Lamar Valley: short stubble heights of native grasses and forbs in later summer, a high density of bison trails, wallows, and scat, continued suppression of young woody plants by browsing, and a general absence of woody and herbaceous riparian vegetation along the banks of the river and tributary streams. In addition, extensive areas of unvegetated alluvium are common, soil compaction and bank collapse along channel margins is widespread, and the physical churning of soils by bison hooves in springs and wetlands has undoubtedly altered the hydrology and biodiversity of these ecologically important areas. In short, high bison numbers in recent years have been an effective agent for accelerating the biological and physical modification of the valley's seeps, wetlands, floodplains, riparian areas, and channels, trends that had begun decades earlier by elk. Ecosystem simplification is well underway, much like that often associated with high levels of domestic livestock use in various areas of the mountain west.

Robert L. Beschta et al., *Bison Limit Ecosystem Recovery in Northern Yellowstone*, 23 Food Webs, 10 (2020). Another study concluded, "[c]ontinued bison use at current population levels will likely result in the continuation of the ongoing loss of diversity and ecosystem services provided by the intact riparian plant communities."

41.    Forage availability in YNP contributes to the migration of brucellosis-infected bison into Montana.

**E.**    **The 2024 BMP**

**i.**    ***The "Cooperating Agency" Process***

42.    In September 2020, NPS circulated a cooperating agency memorandum of understanding (MOU) in preparation of its BMP efforts. *Memorandum of Understanding Between the NPS and the State of Montana* (2020). That MOU, entered into by NPS and the State, outlined each entity's obligations in the "cooperative" relationship. NPS agreed to "communicate candidly about the relevant substantive and procedural aspects of the forthcoming EIS work and attempt to resolve disagreements on issues." *Id.* at 2. NPS also recognized a "shared interest in routine and regular communication of relevant and timely information." *Id.* To that end, NPS agreed, in part, to:

> Seek meaningful input from the cooperating agency at key junctures in the EIS process, including the scoping phase, creation of a draft EIS and while drafting a ROD.

> Keep all parties—primarily via teleconference calls—informed about the timeframes for public scoping, public comments and alternatives under consideration.

> Let the cooperating agency know specifically how and where cooperating agency data, information, or input was incorporated into, or considered in, the EIS, and how it may have influenced the decisions of the lead agency.

> Allow the cooperating agency to review analysis relevant to the information it provided and give meaningful consideration to comments it submitted so that relevant information can be incorporated or changed in the draft EIS before it is released to the public.

*Id.* at 3.

43.    On January 10, 2022, NPS informed cooperators it would be publishing a federal register notice describing its alternatives for consideration. January 10, 2022 was the first time Montana had seen NPS' proposed alternatives. Notice was published January 28, 2022, giving 30 days for public comment. 87 Fed. Reg. 4653 (Jan. 28, 2022). In its February 28, 2022 comment, the State explained its frustration at not being consulted or included in the NPS' formulation of alternatives, especially given the contentious history surrounding bison management. Montana asked that the alternatives be withdrawn in favor of joint meetings, collaboration, and consultation. That request was reiterated to YNP and NPS leadership several more times in 2022 and 2023. It was not until June 29, 2023, that YNP's technical staff finally met with the State's technical staff to discuss the substance of the alternatives and supporting science, or lack thereof.

44.    On July 10, 2023, NPS gave "cooperating" agencies like Montana an opportunity to review the DEIS, and **<u>eleven days</u>** to provide preliminary comment. Montana rushed to comply, providing an abbreviated comment on July 21, 2023. The DEIS was released on August 10, 2023, with a 45-day public comment period. Montana sought a 60-day extension of that period. NPS granted an additional 15 days.

45.    Montana submitted extensive comment, registering many substantive deficiencies in the DEIS and YNP's NEPA process on October 10, 2023. Montana

heard nothing from YNP until May 1, 2024, when it received an advanced copy of the FEIS as a "cooperating agency." The State was given 15 days to review and provide additional comment. The State was also informed that, if it wished, it could request a meeting with NPS regarding the FEIS by May 24, 2024. Montana was unable to take advantage of the abbreviated comment or meeting timeframe.

46.     Prior to release of the Draft EIS or any public process, YNP stated that it favored a range of 3,500-6,000 bison. Similarly, YNP attempted to remove vaccination from its protocols during annual IBMP meetings prior to completion of the FEIS.

47.     The break-neck pace of YNP's NEPA process and exclusion of Montana from cooperative processes, together with statements made by YNP staff, all indicate that the cooperating agency process was a matter of form over substance, and that YNP had chosen a management direction long before the public had an opportunity to be involved.

### ii.     ***The BMP FEIS and ROD***

48.     In June 2024, NPS issued the BMP FEIS. Three alternatives were analyzed through the NEPA process.

49.     Alternative 1, the "No Action" alternative, stated that the YNP bison population

- would be managed at a population range of 3,500-5,000 after calving. *YNP BMP FEIS (BMP FEIS)*, 22 (June 2024).

- would be limited by captures in YNP for BCTP, shipments to slaughter, and hunting outside YNP. *Id.* at 23-24.

- would be managed for a "decreasing population" whenever there were more than 4,300 bison after calving. *Id.* at 23.

- would not be vaccinated. *Id.* at 36.

50.     Alternative 2, the "Preferred Alternative"[4], stated that

- bison would be managed for a population of 3,500-6,000 after calving, and average 5,000 bison. *Id.* at 26.

- bison would be managed for a "decreasing population" when there are more than 5,200 bison in early winter. *Id.* at 27.

- NPS would prioritize using the BCTP to limit population size, releasing brucellosis-negative animals not qualifying for the program and processing brucellosis-positive animals. *Id.*

- Regardless of population size, "NPS may capture bison whenever numbers of bison migrating from the park exceed the capacity provided by Montana's tolerance areas." *Id.* at 28.

- NPS would coordinate with the hunts in Montana.

- Bison would not be vaccinated. *Id.* at 36.

51.     Finally, Alternative 3, stated the bison population

- would range between 3,500-7,000 after calving. *Id.* at 29.

- would be limited through natural selection and hunting. Bison captures for shipment to slaughter would cease. *Id.* at 29-30.

- would continue to supply the BCTP, and NPS would release all bison, regardless of seroprevalence, that do not qualify for the program. *Id.* at 29.

- would not be vaccinated. *Id.* at 36.

---

[4] The FEIS was the first time YNP had identified a "Preferred Alternative," as none was identified in the DEIS.

52.    The BMP ROD was issued on July 23, 2024, identifying Alternative 2 as the alternative selected for implementation.

### iii.    *Montana's Tolerance Zones*

53.    Montana commented at every feasible opportunity during the BMP NEPA process. In its February 2022 comment on YNP's notice of intent to prepare an EIS, and its July 2023 and October 2023 comments on the DEIS, Montana told Defendants that the proposed alternatives were all premised on the assumption that Montana's tolerance zones, expanded in 2011 and 2015, would continue to exist. Montana told YNP this was specious, given each alternative's commitment to increased population and reduced disease management conflicted with two key purposes for Montana's expanded tolerance (*i.e.* conflict management and remote vaccination).

54.    Regardless of these comments, each alternative in the FEIS assumed that Montana's expanded tolerance zone would remain unchanged. In response to Montana's concerns, YNP asserted that the circumstances relied upon by Montana in granting additional tolerance (*i.e.* no active cattle allotments in specific areas, modifications to federal brucellosis rules, etc.) remained unchanged. *Id.* at 181–82. YNP specifically ignored, however, that Montana had granted tolerance to enhance conflict management and accommodate remote vaccination…and that the proposed alternatives undermined those objectives.

55.    The FEIS also repeatedly mischaracterized Montana's *2015 Expansion Decision* as "informally indicat[ing] that several hundred [bison] may be tolerated" outside YNP. *Id.* at 28, 44, 177–78. This conclusion is without foundation, as Montana's *2015 Expansion Decision* did not identify a number to be tolerated outside YNP. The decision did say, multiple times, that the population target of 3,000 would not be changed, regardless of the spatial expansion.

### iv.    Use of the BCTP in the Preferred Alternative

56.    Defendants' preferred alternative "would prioritize using the BCTP to restore bison to tribal lands and tribal harvests outside the park to provide American Indian Tribes with access to traditional resources." *BMP FEIS* at iv. This expansion of the BCTP would result in a reduction of bison sent for processing, and more bison being moved into quarantine before eventual transfer to tribal nations. The BMP FEIS states that under the BCTP, 100 to 300 bison would enter quarantine annually, which is an increase from the number analyzed in the 2016 *Quarantine EA*. By increasing the number of bison in quarantine facilities and eventually transferred to tribal partners, the preferred alternative results in more bison within Montana (outside YNP and Montana's tolerance zones), as compared to the no action alternative. Despite this increase, the BMP FEIS contains no analysis of the environmental impacts from a BCTP that has effectively doubled in size.

### v.    Defendants' Treatment of Vegetation in the FEIS and ROD

57.    The BMP FEIS recognizes that bison have replaced elk as the dominant grazer in YNP, and that increasing populations have increased impacts on plant communities. *Id.* at 107. The BMP FEIS notes that "a challenging dynamic is emerging where invasive plants are capitalizing on the ecosystem modification caused by disturbance, such as from bison." *Id.* These areas of intensive grazing pressure have "lower diversity and less variation in plant functional traits." *Id.* The BMP FEIS dubs these areas "grazing lawns," comparing them to the "grazing lawns" of the Serengeti. *Id.*

58.    The BMP FEIS also recognizes the decrease of woody vegetation in riparian areas, due to grazing. *Id.* at 108. "Bison are likely contributing to the maintenance of grassland-dominated" riparian areas and "limiting aspen growth and recruitment." *Id.* at 108–09. Grazing impacts are also being seen on the sagebrush steppe across the northern YNP, which is "trending away from conditions present at the time the park was created." *Id.* at 110. The BMP FEIS notes that most change occurred between 1963 and present day. *Id.*

59.    Under the "no action" alternative, the BMP FEIS expects cool-season invasives to continue invading, especially in wet grassland areas of YNP. The BMP FEIS also states that "[b]ison would continue to reduce growth and recruitment of woody species such as willow, aspen, and cottonwood," and that these areas would "display an increase in bank disturbance and grazing-tolerant plants." *Id.* at 111–12.

60.    Under the "preferred" alternative, the "no action" alternative's impacts "may increase slightly with more bison on the landscape." *Id.* at 113. There would likely be additional conversion of wet grasslands to "grazing lawns." *Id.* There would be more impacts on the sagebrush steppe. Horning, digging, wallowing, seed dispersal and grazing would "increase winter annual invasions" in these areas. *Id.* "Aspen-dominated areas may transition to grassland-dominated areas as a result of bison trampling and horning[.]" *Id.*

61.    Defendants assert that the level of large herbivory "contribut[ing] to the decline of riparian zones in some northern regions of YNP" and the spread of invasive plants are "natural fluctuations in the ecosystem." *Id.* at 45; *BMP Record of Decision (BMP ROD)*, 24 (July 2024).

62.    Despite admissions that degradation is likely to continue under the "no-action" alternative, and increase under the Preferred Alternative, the NPS made a non-impairment determination in the ROD. *BMP ROD* at 18, 24. Defendants state that "[p]er statute and policy, the NPS manages wildlife and vegetation to sustain them in their natural condition, which includes allowing plant communities to change in response to wildlife" and that "up to an additional 1,000 bison on the landscape . . . is unlikely to impair vegetative communities compared to current conditions." *Id.*

# LEGAL FRAMEWORK

## A.    APA

63.     APA requires courts to "hold unlawful and set aside agency action" that

is

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short
of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to
sections 556 and 557 of this title or otherwise reviewed on the record
of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to
trial de novo by the reviewing court.

5 U.S.C. § 706(2).

64.     An "arbitrary-and-capricious standard requires that agency action be

reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S.

414, 423 (2021). The agency must have acted "within a zone of reasonableness and,

in particular, [have] reasonably considered the relevant issues and reasonably

explained the decision." *Id.*

**B.**   **NEPA**

65.   NEPA creates a "set of action-forcing procedures that require that agencies take a hard look at environmental consequences" before taking action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (cleaned up).

66.   NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal action. NEPA serves two principal purposes:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.

*Id.*

67.   Focusing an agency's attention on a proposed project's environmental consequences, NEPA ensures that impacts will not be "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.*

**C.**   **NPSOA and YNPPA**

68.   YNP was created by an act of Congress signed into law in 1872 that directed the Secretary of the Interior "to make and publish such rules and regulations . . . for the preservation, from injury or spoilation, of all timber, mineral deposits, natural curiosities, or wonders within said park, and their retention in their natural

condition." 42nd Congress, 2d sess., ch. 24, § 2 (Mar. 1, 1872); *see also*, 16 U.S.C. § 22.

69.     The NPS manages YNP as part of the National Park System. 54 U.S.C. § 100101(a). The NPSOA requires NPS "to conserve the scenery, natural and historic objects, and wildlife in the System units and to provide for the enjoyment of [the same] in such manner and by such as will leave them unimpaired for the enjoyment of future generations." *Id.*

## FIRST CLAIM FOR RELIEF:

## THE BMP FEIS IS BASED ON INACCURATE AND FALSE ASSUMPTIONS IN VIOLATION OF NEPA AND THE APA

70.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

71.     The BMP FEIS is premised on incorrect assumptions and data, undermining the FEIS and rendering Defendants unable to meet its "hard look" obligation under NEPA. For that reason, the BMP is arbitrary and capricious and in violation of the law.

72.     "An agency fails to meet its 'hard look' obligation when it relies on incorrect assumptions or data…or presents information that is so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of alternatives." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018) (citation and internal quotation omitted).

73.    The selected alternative provides for a YNP bison population of 3,500-6,000 on the assumption that Montana's tolerance zones will accommodate that population. In fact, all examined alternatives are based on that assumption. However, Montana's 2011 and 2015 tolerance zone expansions only created a spatial expansion for bison and did not create tolerance for population expansion beyond 3,000.

74.    The BMP FEIS' reliance on Montana's tolerance zone to sustain populations beyond 3,000 is an incorrect assumption at best, and a deliberately misleading misstatement at worst. In either circumstance, the goals of NEPA are frustrated and informed decision-making and public participation have not occurred.

75.    The BMP FEIS' misstatements and incorrect assumptions violate NEPA's "hard look" requirement and are an arbitrary and capricious violation of law.

## SECOND CLAIM FOR RELIEF:

### A REDUCTION IN MONTANA'S TOLERANCE ZONE IS A REASONABLY FORESEEABLY CIRCUMSTANCE DEFENDANTS FAILED TO ANALYZE, IN VIOLATION OF NEPA AND THE APA

76.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

77.    Reduction of Montana's tolerance zones is a sufficiently reasonably foreseeable action that Defendants were required to analyze. Defendants' failure to do so is a violation of NEPA and arbitrary and capricious and in violation of law.

78.    Direct impacts are caused by an action and occur at the same time and place as the action. *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1175 (D.C.

Cir. 2023) (citing 40 C.F.R. § 1508.8(a) (2019), now at 40 C.F.R. § 1508.1(i)(1)).

Indirect impacts are those caused by an action and are later in time or farther removed

in distance but are still reasonably foreseeable. *Id.* (citing 40 C.F.R. § 1508.8(b)

(2019), now at 40 C.F.R. §1508.1(i)(2)). NEPA obligates agencies to consider

cumulative impacts of a proposed project together with "past, present, and reasonably

foreseeable future actions." *Ctr. for Cmty. Action & Env't Justice v. FAA*, 51 F.4th

322, 323 (9th Cir. 2022) (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d

886, 895–96 (9th Cir. 2002)); 40 C.F.R. § 1508.1(i).

> DOI's NEPA rules define "reasonably foreseeable future actions" to
>
> include those federal and non-federal activities not yet undertaken, but
> sufficiently likely to occur, that a Responsible Official of ordinary
> prudence would take such activities into account in reaching a decision.
> These federal and non-federal activities that must be taken into account
> in the analysis of cumulative impact include, but are not limited to,
> activities for which there are existing decisions, funding, or proposals
> identified by the bureau. Reasonably foreseeable future actions do not
> include those actions that are highly speculative or indefinite.

43 C.F.R. § 46.30.

79.    A cumulative impacts analysis must consider reasonably foreseeable

future actions "even if they are not yet proposals and may never trigger NEPA-review

requirements." *Fritiofson v. Alexander*, 772 F.2d 1225, 1245 (5th Cir. 1985) (citations

omitted). Vague or conclusory discussion is not sufficient cumulative impact analysis.

*Sierra Club v. Bosworth*, 510 F.3d 1016, 1028 (9th Cir. 2007) (conclusory statements

that there will be no impact is insufficient); *Klamath-Siskiyou Wildlands Ctr. v. BLM*,

387 F.3d 989, 993 (9th Cir. 2004) ("A proper consideration of the cumulative impacts of a project requires some quantified or detailed information."); *Te-Moak Tribe of W. Shoshone of Nev. v. DOI*, 608 F.3d 592, 604–05 (9th Cir. 2010)

80.    Montana's tolerance zone expansion was done, in part, to maintain a wild, free-ranging bison population, reduce the risk of brucellosis transmission from bison to cattle and manage other conflicts, provide greater hunting opportunities, expand opportunity for remote vaccination of bison for brucellosis, and increase IBMP partner knowledge. Each alternative of the BMP FEIS eliminates bison vaccination and exacerbates conflict potential by increasing the number of bison Montana is required to manage.

81.    The BMP FEIS fails to recognize Montana's intentions for tolerance expansion or acknowledge that the BMP undercuts those motivators. On multiple occasions in the NEPA process, Montana told Defendants that its proposed alternatives undermined and threatened Montana's zone of tolerance. *See,* Cmt. on *Notice of Intent to Prepare an EIS*, 3 (Feb. 28, 2022); MDOL and MFWP Ltr. to YNP, 3 (July 21, 2023); Cmt. on DEIS, 12–13 (Oct. 10, 2023).

82.    More critically, both the 2000 ROD and Montana's 2000 ROD state that "[i]f, after the in-Park vaccination program has been initiated, it is terminated or if implementation is deemed inadequate by Montana, Montana will cease tolerating untested bison outside the Park and may withdraw from other joint management

actions." 2000 ROD at 34; 2000 State ROD at 14. After 24 years, Defendants have

not only failed to initiate a remote-vaccination program, but now state that they have

no intention of conducting *any* bison vaccination, remote or other.

83.    Tolerance reduction is a reasonably foreseeable result of Defendants'

actions, and Defendants failure to analyze that reasonably foreseeable result in their

cumulative effects analysis was a violation of NEPA.

## THIRD CLAIM FOR RELIEF:

## THE "NO ACTION" ALTERNATIVE REPRESENTS AN ARTIFICIAL BASELINE IN VIOLATION OF NEPA AND THE APA

84.    Plaintiff realleges and incorporates by reference all preceding

paragraphs.

85.    40 C.F.R. § 1502.16(a) states that the "no action" alternative should

serve as the baseline against which proposed action and alternatives are compared.

Pursuant to DOI's NEPA rules, "no action" may mean "'no change' from a current

management direction or level of management intensity" or "'no project' in cases

where a new project is proposed for implementation." 43 C.F.R. § 46.30.

86.    "When conducting an environmental analysis of a proposed action under

NEPA, an agency compares the action's projected environmental effects to the

existing condition of the environment." *Marin Audubon Soc'y, et al. v. Fed. Aviation

Admin., et al.*, 2024 U.S.App.LEXIS 28621, *24–25 (D.C. Cir. 2024). "The agency's

choice of the baseline for comparison matters a great deal. If the baseline is artificially

high, the agency might erroneously conclude that even highly disruptive actions will have minimal incremental environmental effects." *Id.* at *25. Similarly, a "no action" alternative is meaningless if it assumes the existence of the very plan being proposed. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1037–38 (9th Cir. 2008) (citation omitted). To the contrary, a "no action alternative looks at effects of not approving the action under consideration." *Pac. Coast Fed'n of Fishermen's Ass'ns v. DOI*, 655 Fed. Appx. 595, 598 (9th Cir. 2016) (citing 43 C.F.R. § 46.30).

87.    The "no action" alternative proposed by NPS is characterized as a bison population of between 3,500-5,000. This "no action" alternative is in conflict with the alternative chosen in 2000, which identified a population of 3,000.

88.    Defendants state that the population range is consistent with "consensus agreement among IBMP members on annual operating plans and therefore consistent with the goals of the IBMP." *BMP FEIS* at 176. However, there have been no "consensus agreements" to change population targets. The last time Defendants analyzed YNP bison population size, pursuant to NEPA, was in 2000. Defendants concluded that 3,000 was an appropriate target, as anything above that would likely lead to out-migration. 2000 ROD at 20. While IBMP partners annually discussed the number of bison to be removed from the population, the population target never changed from 3,000. Defendants attempt to move the baseline and avoid their obligation to analyze a true "no action" alternative.

89.    Defendants hold out their "no action" alternative as complying with NEPA rules, specifically 43 C.F.R. § 46.30, which states a "no action alternative" may mean "'no change' from a current management direction or level of management intensity" or "'no project' in cases where a new project is proposed for implementation." *BMP FEIS* at 11. However, Defendants admit that the no action alternative of 3,500-5,000 bison is "loosely based on management experiences during 2001 to 2011"… "when bison summer counts averaged about 3,900 and ranged between 3,000 and 5,000." *Id.* at 176. Even if it were appropriate to use Defendants' skewed baseline of 3,500-5,000, that range conflicts with the directives in 43 C.F.R. § 46.30, as it is based on management 13-23 years ago. *Id.*

90.    Similarly, the 2000 ROD mandates that YNP make every attempt to capture and test bison leaving the park, vaccinating those seronegative animals. Vaccination of bison is reflected in every annual operations plan from 2007-2022. Despite bison vaccination being a clear directive in existing management, each alternative in the BMP FEIS drops vaccination, including the "no action" alternative. *Id.* at 20.

91.    Defendants "no action" alternative is not representative of the management directives in place for YNP bison management prior to the BMP because it does not reflect long-standing 1) population targets and 2) vaccination directives. Defendants' historic failure, or sporadic success, in meeting these targets and

directives does not mean those failures become the "baseline," for doing so is in conflict with both the letter and spirit of NEPA and its implementing regulations.

## FOURTH CLAIM FOR RELIEF:
## DEFENDANTS WERE PRE-DECISIONAL, IN VIOLATION OF NEPA AND THE APA

92.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

93.     NEPA's "hard look" requirement must be taken objectively and in good faith, and not as an exercise in form over substance. *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). An agency is required to use environmental impact statements as the means for assessing the impact of its proposed action and not as the means for justifying decisions already made. 40 C.F.R. § 1502.2(g).

94.     Defendants' behavior and statements during the NEPA process demonstrated they had already identified a course of action, rendering NEPA meaningless. Defendants' pre-decisional behavior was arbitrary, capricious, and a violation of the law.

## FIFTH CLAIM FOR RELIEF:
## DEFENDANTS FAILED TO COOPERATE WITH MONTANA, IN VIOLATION OF NEPA AND THE APA

95.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

96.    NEPA requires federal agencies, "to the fullest extent possible," to "encourage and facilitate public engagement in decisions that affect the quality of the human environment." *WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008) (citing 40 C.F.R. § 1500.2(d)). "To the fullest extent possible" means that "each agency of the Federal Government shall comply with the Act unless an agency activity, decision, or action is exempted from NEPA by law or compliance with NEPA is impossible." 40 C.F.R. § 1500.6.

97.    43 C.F.R. § 46.230, promulgated in 2008, states that "[i]n accordance with 40 C.F.R. § 1501.6,[5] throughout the development of an environmental document, the lead bureau will collaborate, to the fullest extent possible, with all cooperating agencies concerning those issues relating to their jurisdiction and special expertise." 40 C.F.R. § 1501.8[6] states that each cooperating agency shall participate in the NEPA process at the earliest practicable time, participate in the scoping process, consult with the lead agency in developing the schedule for the NEPA process, meet the lead agency's schedule for commenting, and jointly issue environmental documents (to the extent possible).

---

[5] As originally set forth in the 1978 regulations, 40 C.F.R. § 1501.6 pertained to "cooperating agencies." These regulations were subsequently amended in 2020 (85 Fed. Reg. 43304 (July 16, 2020)), and the rule governing "cooperating agencies" is now at 40 C.F.R. § 1501.8. 43 C.F.R. § 46.230 (which references 40 C.F.R. § 1501.6) has not been updated to reflect this change.
[6] See FN 5.

98.     Defendants did not collaborate with Montana in the development of the BMP. To the contrary, Defendants minimized and precluded Montana's participation at every available opportunity. Despite signing a cooperating agency MOU in 2020, the first time Montana even heard about Defendants' proposed alternatives was in 2022, two weeks prior to their publication in the Federal Register. Despite multiple requests, YNP technical staff refused to meet with Montana's technical staff until June 29, 2023…less than two weeks before the DEIS was released for cooperator review. Montana was rendered completely unable to participate in the formulation or analysis of the alternatives subject to the NEPA process. Defendants also excluded Montana from schedule development, subjecting Montana to ludicrous review and comment periods.

99.     Defendants' deliberate and repeated refusal to collaborate with Montana in development of the BMP was an arbitrary and capricious violation of law undermining the entire effort.

## SIXTH CLAIM FOR RELIEF:

## THE FEIS WAS NOT A "SUFFICIENTLY DETAILED STATEMENT", IN VIOLATION OF NEPA AND THE APA

100.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

101.   Agencies conducting major actions are required to prepare a "detailed statement" of the action's environmental impacts. 42 U.S.C. § 4332(2)(C). The

statement is intended to inform and aid the decision-making agency and advise the public of the action's environmental consequences. *Sierra Club v. Clark*, 774 F.2d 1406, 1411 (9th Cir. 1985). Additionally, the statement enables reviewing courts "to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard." *Mass. v. Andrus*, 594 F.2d 872, 883 (1st Cir. 1979). Thus, an agency's NEPA analysis must "explicate fully its course of inquiry, its analysis and its reasoning." *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir. 1971). In order to fulfill these purposes, an agency's EIS "cannot be composed of statements 'too vague, too general and too conclusory.'" *Mass.*, 594 F.2d at 883.

102.   Defendants' preferred alternative relies heavily on the BCTP to facilitate population expansion within Montana, despite neglecting to analyze impacts from repeated and cumulative transfers. Defendants state that in addition to the actions under its 'no action' alternative, the "NPS would prioritize using the BCTP to restore bison to tribal lands." *BMP FEIS* at 25. Under the BMP's preferred alternative, 100-300 bison would enter the BCTP and be moved to unidentified tribal sovereigns. YNP relies on its 2016 *Quarantine EA* and associated FONSI as capturing impacts from the BCTP's implementation. However, the *Quarantine EA*'s impacts analysis was limited to 50 to 150 bison entering quarantine annually, and only referenced transfers to the Fort Peck Reservation. Thus, YNP's decision to forgo an analysis on wildlife

or human impacts from larger bison transfers across Montana's landscape renders its analysis deficiently vague.

103.   Without additional detail on *where* bison will be transferred to, Plaintiff is left to speculate on tribal management practices, facilities, and response procedures if bison leave a reservation. Defendants' decision to omit critical impacts analyses on its preferred alternative is fatal. Defendants should be required to explain how many transfers will occur to each sovereign to ensure Montanans are aware and can adequately participate in the NEPA process.

## SEVENTH CLAIM FOR RELIEF:

## THE FEIS ALTERNATIVES CONSIDERED DEGRADE YNP RANGE AND NATURAL SYSTEMS, IN VIOLATION OF THE NPSOA, THE YNPPA, AND THE APA

104.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

105.   Bison on the YNP northern range are impairing the park's resources on that range by degrading vegetation and riparian and soil resources.

106.   Each alternative analyzed by Defendants degrades YNP's range and natural systems. By maintaining existing bison population levels, existing degradation will continue and likely increase. Increased bison population levels, as contemplated in Alternatives 2 and 3, exacerbate the degradation.

107.   Loss of vegetation in riparian areas, increasing invasive establishment, and lost species diversity in YNP's northern range must be managed to conserve the

scenery, natural and historic objects, and wildlife of YNP and to prevent loss of biodiversity, loss of habitat, streambed erosion and channel widening, and accelerated warming of riparian areas.

108.   By issuing the ROD with a non-impairment determination concerning the effect increased bison population would have on the vegetation within YNP, Defendants are violating the NPSOA and YNPPA and are acting in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

109.   By issuing the ROD setting a target bison population between 3,500 and 6,000 in light of scientific evidence that bison are presently degrading vegetation in the northern range, Defendants have failed to conserve and avoid impairment to park resources in violation of the NPSOA and YNPPA and are acting in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

110.   These legal violations are injuring Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.     Order, declare, and adjudge that Defendants violated the NPSOA, YNPPA, NEPA, and the APA in adopting the BMP ROD and FEIS for YNP bison;

B.    Set aside and vacate the BMP ROD and FEIS and remand these matters to Defendants;

C.    Enter temporary, preliminary and/or permanent injunctive relief, as may be sought by Plaintiff, including enjoining Defendants from implementing the BMP FEIS and ROD;

D.    Enter such other declaratory relief and/or injunctive relief as hereafter prayed for by Plaintiff; and/or

E.    Grant such further relief as the Court deems necessary or appropriate to redress Defendants' legal violations and protect YNP and the natural resources and public lands within, as well as the State of Montana.

DATED this 31st day of December, 2024.

By: */s/ Lindsey Simon*
      Agency Legal Counsel
      Montana Department of Livestock
      *Attorney for Plaintiff*