Anita Y. Milanovich (MSB #12176)
Rachel K. Meredith (MSB #11552)
Office of the Governor
1301 E. 6th Avenue
PO Box 200801
Helena, MT 59620-0801
Phone: 406-444-5503
Email: anita.milanovich@mt.gov
        rachel.meredith@mt.gov
*Counsel for Plaintiff*

Lindsey Simon (MSB #34338757)
Legal Counsel
Montana Department of Livestock
PO Box 202001
Helena, MT 59620-2001
Phone: (406) 444-7631
Email: lindsey.simon3@mt.gov
*Counsel for Plaintiff*

Jeff Hindoien (MSB #4101)
Chief Legal Counsel
Kevin Rechkoff (MSB #54137140)
Montana Department of Fish, Wildlife
and Parks
PO Box 200701
Helena, MT 59620-0701
Phone: (406) 444-4047
Email: jeff.hindoien@mt.gov
        kevin.rechkoff@mt.gov
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| STATE OF MONTANA, BY AND THROUGH ITS GOVERNOR, et al.,<br>　　　　　　Plaintiff,<br>　　v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the United States Department of the Interior, et al.<br>　　　　　　Defendants. | CV 24-180-BLG-BMM<br><br>**BRIEF IN OPPOSITION TO COTTONWOOD ENVIRONMENTAL LAW CENTER AND SIERRA CLUB, MONTANA CHAPTER'S MOTION TO INTERVENE** |

# TABLE OF CONTENTS

I.     FACTS .................................................................................................1

II.    ARGUMENT.................................................................................13

    A. CELC Should Be Denied Intervention as of Right. ...........................13

        1.  CELC fails to claim a significantly protectable interest relating to the subject of the above-captioned action. ...........14

        2.  Disposition of this case will not impair or impede CELC's ability to protect any interests it may have. ............16

        3.  CELC's interests are adequately represented by other parties. ........................................................................17

    B. CELC Should Be Denied Permissive Intervention. ...........................21

        1.  CELC failed to demonstrate a conditional right to intervene. ...............................................................................21

        2.  CELC's claims and defenses may share a common question of law and fact, but other factors strongly weigh against permissive intervention. ................................23

    C. If this Court Allows CELC's Intervention, Said Intervention Should Be Limited. ......................................................................................26

III.   CONCLUSION .......................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Akina v. Haw.,* 835 F.3d 1003 (9th Cir. 2016) .......................................................25

*Arakaki v. Cayetano,* 324 F.3d 1078 (9th Cir. 2003) ......................... 17, 18, 25, 26

*Beckman Indus. v. Int'l Ins. Co.*, 966 F.2d 470 (9th Cir. 1992) ............................22

*Cal. v. Tahoe Reg'l Planning Agency*, 792 F.2d 775 (9th Cir. 1986) ...................17

*Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013 (9th Cir. 2022) .......................................................................................24

*Callahan v. Brookdale Senior Living Cmtys.*, 2020 U.S.Dist. LEXIS
153378 (C.D. Cal. 2020) ..........................................................................24

*CELC v. Bullock, et al.*, 2020 U.S. App. LEXIS 32484
(9th Cir. 2020) ........................................................................................11

*CELC v. Burgum,* Case No. 2:18-cv-00012-BMM .................................. *in passim*

*CELC v. Bernhardt,* 796 Fed. Appx. 368 (9th Cir. 2019) (unpublished) ................9

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893
(9th Cir. 2011) ........................................................................................17

*Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc.*, 642 F.3d
728 (9th Cir. 2011) ..................................................................................26

*Donnelly v. Glickman*, 159 F.3d 405 (9th Cir. 1998) ...............................14

*Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836
(9th Cir. 2011) ........................................................................................22

*Fund for Animals, Inc. v. Lujan*, 794 F. Supp. 1015 (D. Mont. 1991) ................1, 2

*Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391 (9th Cir. 1992) ........................2, 3

*Kalbers v. U.S. DOJ*, 22 F.4th 816 (9th Cir. 2021) .............................................14

*Kelley v. Summers*, 210 F.2d 665 (10th Cir. 1954) .......................................... 14, 16

*Laub v. DOI*, 342 F.3d 1080 (9th Cir. 2003) ................................................... 10, 11

*League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297
(9th Cir. 1997) ..................................................................................... 18, 19

*Montana, et al. v. U.S., et al.*, 6:95-cv-00006-CCL-RMH .....................................3

*SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236 (2nd Cir. 1972) ...............................23

*Sierra Club v. EPA*, 995 F.2d 1478 (9th Cir. 1993) ...............................................13

*Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326 (9th Cir. 1977) ........ 23, 24

*Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370 (1987) ..................26

*Venegas v. Skaggs*, 867 F.2d 527 (9th Cir. 1989) ..................................................23

*U.S. v. Wash.,* 641 F.2d 1368 (9th Cir. 1981) .......................................... 15, 18, 20

*W. Watersheds Project v. Salazar*, 766 F. Supp. 2d 1095
(D. Mont. 2011) ....................................................................................2-3

*Wash. v. Wash. St. Commercial Passenger Fishing Vessel Ass'n*,

443 U.S. 658 (1979) ............................................................ 15, 18, 20

*Wildearth Guardians v. Salazar*, 272 F.R.D. 4 (D.C.C. 2010) .............................26

*Wilderness Soc'y v. USFS*, 630 F.3d 1173 (9th Cir. 2011) ...................................13

**Constitution, Statutes, Regulations & Rules**

F. R. Civ. P. 24 (advisory committee note on 1966 amendments) ........................26

F. R. Civ. P. 24(a) ...........................................................................13

F. R. Civ. P. 24(a)(2) ................................................................... 13, 27

F. R. Civ. P. 24(b) .................................................................... 21, 23

F.R. Civ. P. 24(b)(1) ................................................................ 21, 22

F.R. Civ. P. 24(b)(1)(A) ..................................................................21

F. R. Civ. P. 24(b)(1)(B) ................................................................27

F. R. Civ. P. 24(b)(3) ...................................................................21

# TABLE OF EXHIBITS

**Exhibit 1:** National Academies of Sciences, Engineering, and Medicine, *Revisiting Brucellosis in the Greater Yellowstone Area* (2020).

**Exhibit 2:** United States Departments of the Interior (National Park Service) and Agriculture (Forest Service and Animal and Plant Health Inspection Service), *Record of Decision for Final Environmental Impact Statement and Bison Management Plan for the State of Montana and Yellowstone National Park* (Dec. 20, 2000).

**Exhibit 3:** Montana Departments of Fish, Wildlife and Parks and Livestock, *Interagency Bison Management Plan for the State of Montana and Yellowstone National Park Record of Decision and Attachments 1 and 2* (Dec. 22, 2000).

**Exhibit 4:** Steve Bullock, *Decision Notice: Year-Round Habitat for Yellowstone Bison Environmental Assessment* (Nov. 2015).

**Exhibit 5:** National Park Service, *The Use of Quarantine to Identify Brucellosis-free Yellowstone Bison for Relocation Elsewhere* (Jan. 14, 2016).

**Exhibit 6:** National Park Service, *Finding of No Significant Impact: The Use of Quarantine to Identify Brucellosis-free Yellowstone Bison for Relocation Elsewhere* (May 14, 2018).

**Exhibit 7:** National Park Service, *Record of Decision Bison Management Plan* (July 2024).

Plaintiff State of Montana, by and through its Governor, Montana Department of Livestock (MDOL), and Montana Department of Fish, Wildlife and Parks (MFWP) (collectively, Plaintiff) hereby files this brief in opposition to Cottonwood Environmental Law Center and Sierra Club, Montana Chapter's (collectively, CELC) *Motion to Intervene* (Doc. 13) in the above-captioned case.[1]

## I.     FACTS

### *Management of Yellowstone National Park (YNP) Bison and Brucellosis*

Brucellosis is a transmissible disease causing fetal abortion and sterility in livestock and "undulant fever" in humans.  *Fund for Animals, Inc. v Lujan,* 794 F. Supp. 1015, 1019 (D. Mont. 1991).  In 1988, 54% of YNP bison tested positive for the disease, and more recent studies suggest roughly 60% of YNP bison are seropositive.  *Id.*; Nat'l Academies of Sciences, Engineering, and Medicine (NAS), *Revisiting Brucellosis in the Greater Yellowstone Area*, 10 (2020), attached as Exhibit 1.

There is no treatment for animals with brucellosis.  Decl. Tahnee Szymanski ¶ 6, Mar. 12, 2025.  When brucellosis "reactors" are identified through testing, state and federal health officials work together to initiate a series of actions.  *Id.* at ¶ 18.  The herd of origin is quarantined, limiting its movement.  *Id.*  "Reactor"

---

[1] The Court provided opportunity for response briefing on motions to intervene. Doc. 34.  Plaintiff moved the Court for an extension of time to file said brief on March 12, 2025.  Doc. 36 and 37.  The motion remains pending.

animals are slaughtered for confirmatory testing. *Id.* If confirmatory testing establishes that the animal(s) did indeed have brucellosis, the entire herd of origin is tested. *Id.* If additional "reactors" are identified, the slaughter and testing cycle continues and the herd remains quarantined. *Id.* at ¶ 19. The herd must complete 1-2 additional whole herd tests, without reactors. *Id.* One of those tests must be administered after calving. *Id.* Only after successful completion of these tests can the herd be released from quarantine. *Id.* During this process, local veterinarians are contacted and other livestock herds exposed to the affected herd are identified, traced, and subject to testing. *Id.* at ¶ 20.

Since at least the early 1980s, YNP bison management has been a point of contention between Montana and the federal government, especially the National Park Service (NPS), because of brucellosis. In 1985, Montana obtained its "brucellosis-free" status from the United States Department of Agriculture's Animal and Plant Health Inspection Service (APHIS) after 30 years of effort and expending $30 million. *Fund*, 794 F. Supp. at 1019. This status directly affects the ability of Montana's livestock producers to ship their cattle nationally and internationally. *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1401-1402 (9th Cir. 1992). Increases in YNP's bison population led to significant numbers of bison moving into Montana, threatening to transmit disease to Montana's livestock industry and undermine its critical APHIS status. *W. Watersheds Project v.*

*Salazar*, 766 F. Supp. 2d 1095, 1102-1103 (D. Mont. 2011); *Fund*, 962 F.2d at 1401-1402.

This situation ultimately led Montana to file suit against the Secretaries of Interior and Agriculture, *Montana*, *et al. v. U.S., et al.*, 6:95-cv-00006-CCL-RMH, in 1995.  As a product of this lawsuit, Montana and the federal government adopted bison management plans, referred to as the Interagency Bison Management Plan (IBMP). NPS, APHIS, and U.S. Forest Service (USFS), *Record of Decision for Final Environmental Impact Statement and Bison Management Plan for the State of Montana and Yellowstone National Park* (Dec. 20, 2000), attached as Exhibit 2; MFWP and MDOL, *Interagency Bison Management Plan for the State of Montana and Yellowstone National Park Record of Decision and Attachments 1 and 2* (Dec. 22, 2000), attached as Exhibit 3.  The plans mirrored each other in many respects, and set forth the scope of each agency's actions within their jurisdiction. *Id.*

Both the state and federal plans recognized "zones" of tolerance in Montana warranting different management actions.  Ex. 2 at 21-34; Ex. 3 at Attach. 1, p. 2-14.  Montana does not tolerate YNP bison in Zone 3 at any time.  Ex. 2 at 26, 31; Ex. 3 at Attach. 1, p. 5, 9.  As recognized in both the state and federal plans, hazing and lethal removal are utilized by Montana to achieve zone containment.  *Id.*  In the past, APHIS has assisted Montana's agencies in ensuring zone containment.

*CELC v. Burgum,* Case No. 2:18-cv-00012-BMM (*CELC*), Doc. 129-3 at ¶¶ 12, 14. NPS does not assist Montana's agencies in ensuring zone containment and those activities take place beyond NPS' boundary and jurisdiction. *CELC* Doc. 129-2 at ¶ 8; *CELC* Doc. 244-2 at ¶ 7.

The boundary between Zone 2 and Zone 3 has changed over time. Where tolerance for bison was once limited to a corridor north of YNP and an area west of YNP, Zone 2 was expanded in 2015. *Compare* Ex. 2 at 7 and Steve Bullock, *Decision Notice: Year Round Habitat for Yellowstone Bison Environmental Assessment*, 7-8 (Nov. 2015), attached as Exhibit 4. While the present boundary may be an "arbitrary political boundary," Doc. 14 at 6, it is a significant geographic boundary with mountain passes and hydrologic divides that Montana uses to help control bison movements. Ex. 4 at 6.

Like bison, elk also carry brucellosis. The 2020 NAS publication attributes 27 livestock herd infections since 1998 in the Greater Yellowstone Area (GYA) to elk. Ex. 1 at 169. However, the reason bison have not spread brucellosis to cattle in the GYA is ***because*** of the separation and containment practices outlined in the 2000 federal and state bison management plans. *Id.* at 11 (Since 1998, the IBMP has been "implemented to achieve the spatial separation of bison and cattle, which has dramatically reduced the risk of bison transmitting *B. abortus* to cattle."), 92 ("The IBMP has been effective in maintaining the separation of bison and cattle,

and there is no evidence that there has been transmission of brucellosis from wild bison to cattle in the GYA since the IBMP was implemented."), 169 (There have been no cases of transmission from YNP bison to livestock which is "likely a result of bison management practices outlined in the [IBMP] combined with fewer cattle operations" in areas where bison leave YNP.); *see also*, Ex. 4 at 9-10.  Maintaining the boundary between Zones 2 and 3 with hazing and lethal removal has been critical to ensuring temporal and spatial separation between livestock and highly-diseased, highly contagious, YNP bison.  The NAS ***recommends the continuation of these separation practices***.  *Id.* at 176.

### **Bison Harvest in the GYA**

In 2004, MFWP published a final environmental assessment (EA) for bison hunting and issued a decision notice.[2,3]  The EA evaluated the feasibility of a hunt for bison entering Montana from YNP, examining four alternatives.[4]  The decision authorized bison hunting, the terms of which are set in MFWP's annual season-

---

[2] MFWP, *Final Bison Hunting Environmental Assessment* (Sept. 30, 2004), https://ibmp.info/Library/Hunt/4%20-%20Hunt%201%20EA.pdf (last accessed Mar. 6, 2025) ("Hunt EA").
[3] MFWP, *Decision Notice Bison Hunting* (2004), https://ibmp.info/Library/Hunt/4%20-%20Hunt%202%20ROD.pdf (last accessed Mar. 6, 2025) ("Hunt Decision").
[4] Hunt EA at 42-84.

setting process.[5]  The EA and decision evaluated hunter safety, finding no issues that would preclude a season.[6]

Shortly thereafter, tribal entities began exercising reserved treaty rights by hunting bison on the northern and western boundaries of YNP.  Decl. Quentin Kujala ¶¶ 4-7, Mar. 12, 2025. Since that time, the number of bison harvested by tribal hunters has exceeded the number of bison taken pursuant to state-issued licenses.  *Id.* at ¶¶ 8-9, 13.

During tribal treaty hunting season, MFWP works with tribal entities and the public to coordinate hunting activity.  *Id.* at ¶ 10.  In-field safety meetings between MFWP, tribal hunters, and public hunters, occur frequently to discuss hunt strategies.  *Id.* MFWP also meets with tribal representatives weekly to discuss safety, bison movement, and enforcement updates.  *Id.* at ¶ 11.  MFWP also meets with tribes after the treaty hunting season is complete, to debrief and discuss efficacy of safety measures.  *Id.* at ¶ 12.

NPS has no jurisdiction or regulatory authority over either public or tribal hunts occurring in Montana and outside the borders of YNP.  *CELC* Doc. 244-2 at ¶ 6.

---

[5] Hunt Decision at 25.
[6] *Id.* at 17-18.

***Quarantine Program Development***

In 2004, MFWP and APHIS initiated research on the feasibility of a bison quarantine program.[7]  This program involved holding seronegative bison for a designated period of time and incorporating a testing and removal protocol to remove animals testing positive for brucellosis.[8]  In 2009, MFWP evaluated the translocation of quarantine graduates, placing 88 bison on the Green Ranch near Ennis, Montana.[9]

In 2016, YNP released an EA for *The Use of Quarantine to Identify Brucellosis-free Yellowstone Bison for Relocation Elsewhere (Quarantine EA)*. NPS, *Quarantine EA* (Jan. 14, 2016), attached as Exhibit 5.  The *Quarantine EA* analyzed the expansion of existing quarantine facilities and operations for the eventual transfer of bison to public or tribal lands in Montana.  Alternatives analyzed included annual captures totaling between 50 and 150 bison.  *Id.* at 31.  A Finding of No Significant Impact (FONSI) was issued in 2018 and facilities were expanded accordingly.  NPS, *Finding of No Significant Impact: The Use of*

---

[7] MFWP and APHIS, *Preliminary Environmental Assessment-Feasibility Study of Bison Quarantine Phase 1*, (Oct. 2004),  https://ibmp.info/Library/BQFS/5%20-%20Quarantine1_Feasability%20Study%20Phase1.pdf (last accessed Mar. 6, 2025).
[8] *Id.* at 3.
[9] MFWP, *Bison Translocation, Bison Quarantine Phase IV Environmental Assessment*, *Decision Notice* (Feb. 2010), https://ibmp.info/Library/BQFS/Bison%20Quarantine%20Translocation%20Decision%20Notice.pdf (last accessed Mar. 6, 2025).

*Quarantine to Identify Brucellosis-free Yellowstone Bison for Relocation*
*Elsewhere* (May 14, 2018), attached as Exhibit 6.  Part of these activities included
operations on the Fort Peck Reservation.  *Id.* at 4.  With the FONSI's issuance,
YNP began implementing the Bison Conservation Transfer Program (BCTP).

## CELC v. Burgum, et al., *Case No. 2:18-cv-00012-BMM*

In 2018, CELC initiated suit against NPS, USFS, APHIS, MDOL, MFWP,
and various individuals in their official capacities.  *CELC v. Zinke, et al.*, 2:18-cv-
00012-SEH (Feb. 8, 2018).[10]  CELC alleged that 1) tribal hunting occurring
outside YNP was "significant new information" requiring supplemental NEPA
analysis for the IBMP, 2) bison hazing operations threatened the safety of the
public and personnel, warranting supplemental NEPA analysis for the IBMP, 3) a
2017 NAS publication discussing the spread of brucellosis by elk warranted
supplemental NEPA analysis for the IBMP, and 4) that NPS had new bison
population goals, constituting significant new information or circumstances
warranting supplemental NEPA analysis for the IBMP.  *CELC* Doc. 46 at 8-11.[11]

---

[10] This case is presently captioned *CELC v. Burgum, et al.*, 2:18-cv-00012-BMM.
[11] *CELC* Doc. 46 was CELC's second amended complaint in that case.  Previously,
CELC had filed a complaint (*CELC* Doc. 1) and an amended complaint (*CELC*
Doc. 7).  State defendants filed a motion to dismiss the amended complaint,
pursuant to F. R. Civ. P. 12(b)(1) and 12(b)(6), *CELC* Doc. 12 and 13.  Federal
defendants also filed a motion to dismiss for failure to state a claim and lack of
jurisdiction.  *CELC* Doc. 18.  It would appear that prior to resolution of those
motions, CELC sought leave from the court to file a second amended complaint,

Requested relief included 1) a declaration that defendants violated NEPA by failing to determine whether supplementation was warranted, 2) a declaration that defendants violated NEPA by failing to supplement, 3) an order enjoining defendants from enforcing the "Zone 2 drop dead line until NEPA deficiencies [were] cured," 4) an order enjoining defendants from hazing, harassing, or killing any bison in or near YNP until NEPA deficiencies had been addressed, and 5) an order enjoining the slaughter of bison in quarantine until NEPA deficiencies were cured. *Id.* at 11.

On October 12, 2018, then-Governor Steve Bullock filed a motion to dismiss CELC's second amended complaint for failure to state a claim. *CELC* Doc. 74 and 49. Federal defendants also filed a motion to dismiss for failure to state a claim and jurisdiction. *CELC* Doc. 75 and 47. Those motions were granted on February 20, 2019, and CELC's second amended complaint was dismissed with prejudice. *CELC* Doc. 81.

On appeal, the Ninth Circuit affirmed in part, and reversed and remanded in part. *CELC v. Bernhardt*, 796 Fed. Appx. 368 (9th Cir. 2019). While CELC had

---

*CELC* Doc. 28. That motion was initially denied without prejudice for failure to comply with L.R. 7.1(d)(1)(A). *CELC* Doc. 30. CELC again sought leave to file a second amended complaint, *CELC* Doc. 32 and 33, which was granted September 26, 2018. *CELC* Doc. 44 and 45. With the filing of the second amended complaint, *CELC* Doc. 46, MFWP and MDOL were terminated from the case, leaving then-Governor Steve Bullock as the sole state defendant.

established Article III standing to pursue claims against the federal defendants, the

Ninth Circuit ordered a remand to determine whether CELC had demonstrated

Article III standing sufficient to pursue its NEPA claims against state defendants.

*Id.* at 370.  The Court also ruled that while Counts 1 (tribal hunting) and 3 (NAS

publication) had been sufficiently pled, Counts 2 (bison hazing) and 4 (new

population goals) did "not state plausible claims for NEPA supplementation…."

*Id.* at 371.  CELC had also failed to establish Article III standing to support its

prayer for relief relating to bison quarantine operations.  *Id.*  The Court concluded

that there could be facts related to Counts 2 and 4 and CELC's requested

quarantine-related relief, and remanded to the district court to allow CELC the

opportunity to seek leave to amend its complaint accordingly.  *Id.* at 371-372.

On March 3, 2020, CELC filed a third amended complaint.  *CELC* Doc. 91.

This complaint dropped Count 2 (bison hazing) and any relief sought specific to

the quarantine program.  *Id.* Again, Governor Bullock filed a motion to dismiss for

failure to state a claim.  *CELC* Doc. 119.  On June 30, 2020, the Court granted that

motion and dismissed all claims against Governor Bullock.  *CELC* Doc. 212.  The

Court concluded that state and federal management of YNP bison were not

"'sufficiently interrelated to constitute a single federal action for NEPA

purposes.'"  *CELC* Doc. 212 at 12 (quoting *Laub v. DOI*, 342 F.3d 1080, 1092 (9th

Cir. 2003)).  Notably, the Court went on to say "[i]t is clear that the Federal

Defendants do not exert 'power, authority, or control over' the state's management of bison outside of [YNP], and the limited federal funding the state may receive in relation to the IBMP does not render the state's bison management policies federalized under NEPA." *Id.* at 12-13 (quoting *Laub*, 342 F.3d at 1083).[12]

On July 1, 2020, the federal defendants filed a motion to remand without vacatur. *CELC* Doc. 244. NPS had decided to prepare additional NEPA analysis considering "at least: (1) significant changed circumstances since the IBMP's adoption in 2000; (2) the impacts of adaptive management changes to the IBMP since its adoption; and (3) a range of alternative options for bison management in [YNP]." *CELC* Doc. 244-1 at 1-2. Importantly, federal defendants stated that while USFS "has expressed its willingness and intention to ***participate as a cooperating agency***" in NPS' endeavor, APHIS had not determined the nature of its participation, "if any." *Id.* at 2 (emphasis added); *see also*, *CELC* Doc. 249. CELC did not oppose the remand, nor contest the scope of remand in federal defendants' motion. *CELC* Doc. 246 at 2.

On December 10, 2020, the Court granted voluntary remand without vacatur, ordering: "(a) Federal Defendants shall conduct an additional NEPA

---

[12] Again, CELC appealed to the Ninth Circuit. *CELC* Doc. 243. Governor Bullock moved to dismiss that appeal for lack of jurisdiction. *CELC v. Bullock, et al.*, Case 20-35588, Doc. 2-1 (9th Cir.). On October 15, 2020, the Ninth Circuit issued an order granting that motion. *CELC v. Bullock, et al.*, 2020 U.S. App. LEXIS 32484 (9th Cir. 2020).

analysis of the IBMP and issue an appropriate final agency decision, which could include any of the review options articulated above, including revision of the current IBMP; (b) The IBMP shall remain in full force and effect pending issuance of whatever replacement final agency decision is found to be necessary and appropriate; (c) Federal Defendants' request for a stay is DENIED." *CELC* Doc. 253 at 5-6.

In June 2024, NPS issued the final environmental impact statement for its bison management plan (BMP).  In July 2024, NPS issued its record of decision. NPS, *Record of Decision Bison Management Plan* (July 2024), attached as Exhibit 7.  Consistent with the motion for voluntary remand filed in *CELC*, USFS and APHIS were cooperating agencies in the process.  *Id.* at 1; *CELC* Doc. 244-1 at 1-2.

On January 27, 2025, CELC filed a motion to reopen *CELC* and "enforce" the terms of the Court's remand order.  *CELC* Doc. 278.  While NPS promulgated the 2024 BMP, CELC argues that APHIS and USFS have failed to complete their supplemental NEPA analysis that the "Court previously ordered."  *CELC* Doc. 279 at 2.

## II.    <u>ARGUMENT</u>

### A. <u>CELC Should Be Denied Intervention as of Right</u>.

F. R. Civ. P. 24(a) provides that a Court must permit intervention to anyone who "1) is given an unconditional right to intervene by a federal statute; or 2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  CELC does not assert an unconditional right to intervention, leaving only intervention of right, as articulated in F. R. Civ. P. 24(a)(2).

The Ninth Circuit applies a four-part test when analyzing a motion to intervene under F. R. Civ. P. 24(a)(2):

1) the motion must be timely;
2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action;
3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and
4) the applicant's interest must be inadequately represented by the parties to the action.

*Wilderness Soc'y v. USFS*, 630 F.3d 1173, 1177 (9th Cir. 2011) (quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993)).  The test is conjunctive,

meaning an applicant for intervention must demonstrate each prong of the test to be granted status.

CELC's motion is timely.  However, CELC fails to articulate a significantly protectable interest related to the subject of this action, fails to show that disposition of this case might practically impair or impede that interest, and fails to demonstrate that its interests are inadequately represented by parties in this case. For these reasons, CELC's request for intervention as of right should be denied.

**1. <u>CELC fails to claim a significantly protectable interest relating to the subject of the above-captioned action.</u>**

A proposed intervenor has a "significant protectable interest" in an action if: "1) it asserts an interest that is protected under some law, and 2) there is a relationship between its legally protected interest and the plaintiff's claims." *Kalbers v. U.S. DOJ,* 22 F.4th 816, 827 (9th Cir. 2021) (quoting *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998)).   To authorize intervention as a matter of right, the proposed intervenor "must have an interest in the subject matter of the litigation of such a nature that he will gain or lose by the direct legal operation of the judgment."  *Kelley v. Summers*, 210 F.2d 665, 673 (10th Cir. 1954).

Three interests are alleged by CELC: 1) an interest in "allowing Yellowstone bison to repopulate and roam free on federal public lands in Montana," 2) an interest in "more Yellowstone bison being transferred to Native American Tribes,"

and 3) treaty hunting rights of the Crow Tribe, Blackfeet Tribe, and Confederated Salish and Kootenai Tribes (CSKT).  Doc. 14 at 11-12.

Treaty hunting rights are legally protected interests.  But, whatever treaty rights may be implicated in this case, which Plaintiff does not concede, belong to the tribes alone to advance.  *U.S. v. Wash.*, 641 F.2d 1368, 1372 (9th Cir. 1981) ("The appellants [State of Washington] seek to exercise treaty rights as tribes. They may do so only if they are the tribes that signed the treaties.").  CELC, as a named party, has not demonstrated any authority to advance treaty rights in this case, even if it counts tribal members amongst its organizational membership.  *Id.*; *see also, Wash. v. Wash. St. Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675 (1979) (A treaty is "essentially a contract between two sovereign nations.") As the Fort Peck Assiniboine and Sioux Tribes' (Fort Peck Tribes) motion for intervention (Doc. 25) shows, Montana tribes are capable and able to assert and protect their own interests as desired. Treaty rights held by a sovereign cannot form the basis of CELC's intervention, as third parties do not have standing to argue on behalf of a tribe.

Beyond treaty hunting rights, CELC's generalized interests in bison repopulation and roaming patterns and in bison transfer to tribal entities are not "legally protected interests" sufficient to demonstrate a "significant protectable interest."  CELC has not sufficiently articulated a legal entitlement that bison be

provided to tribal entities, nor a legal entitlement to a specifically sized bison population located on specific lands.

CELC fails to establish a significantly protectable interest relating to the subject of this action, and intervention of right should be denied.

## 2.  Disposition of this case will not impair or impede CELC's ability to protect any interests it may have.

Assuming, *arguendo,* that the interests advanced by CELC are "significantly protectable", ***none*** of the interests articulated by CELC (including those associated with treaties) will be lost or impaired by operation of judgment in this case. *Kelley, supra.*  Should this Court issue a ruling vacating and remanding the BMP, management practices existing prior to the BMP would continue.  Bison would continue to repopulate and roam tolerance areas designated by Montana.  Bison would continue to be transferred to Native American tribes pursuant to the 2016-2018 NEPA processes creating the BCTP.  Ex. 5 and 6.  Tribes with valid treaty rights would continue to hunt bison on the periphery of YNP, as they have since 2005.  *See,* FN 2, FN 3, and Decl. Kujala at ¶¶ 7, 13-14.

These activities occurred prior to promulgation of the 2024 BMP, primarily because they were tied to separate and distinct Montana Environmental Protection Act (MEPA) and NEPA decisions and treaties.  These activities will continue if the BMP is vacated and the issue remanded.  Nothing in the BMP was a grant of right to CELC, and its vacatur will not come at a loss to CELC.  *Kelley, supra.*

### 3. **CELC's interests are adequately represented by other parties.**

Any interests properly advanced by CELC are adequately represented by other parties. The factors guiding whether a present party adequately represents the interests of a proposed intervenor are:

1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments;
2) whether the present party is capable and willing to make such arguments; and
3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect.

*Arakaki v. Cayetano,* 324 F.3d 1078, 1086 (9th Cir. 2003) (citing *Cal. v. Tahoe Reg'l Planning Agency*, 792 F.2d 775, 778 (9th Cir. 1986)).

CELC fails to acknowledge that a rebuttable presumption of adequate representation arises when an existing party and an applicant for intervention "share the ultimate objective," or where "the government is acting on behalf of a constituency that it represents." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011) and *Arakaki*, 324 F.3d at 1086. When such a presumption arises, the applicant must make a "compelling showing" to the contrary. *Id.* Additionally, where a proposed intervenor has not alleged "substantive disagreement between it and the existing parties to the suit, and instead has rested its claim for intervention entirely upon a disagreement over litigation strategy or legal tactics, courts have been hesitant to accord the applicant

full-party status." *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1306 (9th Cir. 1997).

CELC argues that defendants are incapable of adequately representing CELC's position because: 1) "NPS has acknowledged it 'does not have regulatory authority or jurisdiction over hunts or other management actions that occur outside YNP'" and cannot adequately protect the treaty interests of CELC's tribal members, 2) "Montana is challenging bison transfer pursuant to the 2024 Yellowstone [BMP]," and while CELC has an interest in expedited quarantine protocols, "Federal Defendants have indicated they do not have control over the bison quarantine protocol", and 3) federal defendants previously moved "numerous" times to dismiss *CELC*, a case that "catalyzed" the BMP at issue here. Doc. 14 at 13-15. These arguments fail to allege a "substantive disagreement" between CELC and defendants and fail to overcome the presumption of adequacy associated with the federal government's participation in this case. *Arakaki*, *supra*.

First, hunting outside YNP is not at issue in Plaintiff's case, so defendants' lack of attendant jurisdiction is irrelevant. Assuming hunting outside YNP boundaries were central to this case, CELC offers no compelling explanation as to how it can assert treaty hunting interests. Indeed, CELC as an organization does not represent, and cannot advance, those treaty rights. *Wash*, 641 F.2d at 1372; *Fishing Vessel Ass'n*, 443 U.S. at 675. To the extent defendants are unable to

adequately represent treaty interests by virtue of its limited jurisdiction, CELC is similarly positioned, unable to assert those interests on behalf of the sovereign to which they belong.

Second, CELC mischaracterizes the nature of Montana's challenge. Montana does not "challeng[e] bison transfer" under the BCTP.  Doc. 14 at 14. Similarly, bison quarantine protocols associated with how long bison are held, or how many times they are tested, are not the subject of Montana's suit.  At issue in this suit is the ***unanalyzed expansion*** of the BCTP in the BMP.  Doc. 1 at 47-49. Additionally, it is wholly unclear what CELC hopes to accomplish in terms of quarantine protocol, through intervention, when defendants "do not have control" over those protocols.  Doc. 14 at 15.

Third, the fact that defendants (both state and federal) repeatedly moved to dismiss CELC's claims in *CELC* for failure to state a claim and jurisdiction is ***not*** determinative of whether CELC's interests are adequately represented here. *League of United Latin Am. Citizens, supra.*  In fact, it was defendant's motion for voluntary remand in *CELC*, and not any particularly successful argument waged by CELC, that led to the BMP's promulgation.  While CELC advances defendants' repeated motions to dismiss in *CELC* as an indication of inadequacy here, the more compelling view is that defendants voluntarily pursued a new BMP despite CELC's repeated failure to sufficiently allege a claim in that case.

Finally, to the extent that CELC has articulated valid interests, those interests overlap with those asserted by Intervenors Fort Peck Tribes, Defenders of Wildlife, Greater Yellowstone Coalition, National Parks Conservation Association, and Park County Environmental Council (collectively, Fort Peck Tribes and Conservation Groups). CELC's declarants articulate interests in expedited quarantine protocols and transfer of bison to tribal entities; bison for cultural and spiritual purposes; commercial use of bison; subsistence use of bison; and advancing bison conservation. Doc. 14-1 at ¶¶ 7-10; Doc. 14-2 at ¶¶ 16-20; Doc. 14-3 at ¶¶ 8, 10-11; Doc. 14-4 at ¶¶ 8, 10-11; Doc. 14-5 at ¶¶ 8, 10-11; Doc. 14-6 at ¶¶ 8, 10-11; and Doc. 14-7 at ¶¶ 8, 10-11. All of those same interests, however, are represented by the Fort Peck Tribes and Conservation Groups.  Doc. 26-4 at ¶¶ 8-11; Doc. 26-5 at ¶¶ 5, 9-10, 17; Doc. 26-6 at ¶¶ 3-5, 11; Doc. 26-7 at ¶¶ 7, 11, 16, 18; Doc. 26-9 at ¶¶ 8, 10, 12, 25, 33.  The only unique interest advanced by CELC is that associated with tribal treaty hunting.  However, as discussed previously, these are not CELC's interests to advance, but rather the tribal sovereigns to whom the rights belong.  *Wash.*, 641 F.2d at 1372; *Fishing Vessel Ass'n,* 443 U.S. at 675.

CELC fails to make a compelling showing that its valid interests are inadequately represented by existing parties, and intervention of right should be denied.

## B. **CELC Should Be Denied Permissive Intervention**.

F. R. Civ. P. 24(b) provides that a Court may permit intervention to those timely movants who 1) are given a conditional right to intervene by a federal statute, or 2) have a claim or defense that shares a common question of law or fact with the main action.  In exercising its discretion over permissive intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  F. R. Civ. P. 24(b)(3).

CELC's motion for intervention is timely. However, CELC has failed to demonstrate a conditional right to intervene (pursuant to F. R. Civ. P. 24(b)(1)(A)). While CELC may present a claim or defense sharing a common question of law and fact in this case, other factors weigh heavily against intervention under F. R. Civ. P. 24(b)(1)(B).

### 1. **CELC failed to demonstrate a conditional right to intervene.**

Because CELC intends to litigate a claim on the merits, it is required to demonstrate the jurisdictional grounds required under F. R. Civ. P. 24(b)(1) to obtain intervention under that provision.

CELC argues that it may intervene "because it relies on the same federal statutes that the State of Montana does."  Doc. 14 at 16. CELC states that in cases involving federal question jurisdiction, "the jurisdictional concern drops away because the 'district court's jurisdiction is grounded in the federal question(s)

raised by the plaintiff.'" *Id.* (quoting *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011)).

> To that end, the complaint filed by the State of Montana invokes federal-question because the action arises under the laws of the United States, including [NEPA] and the [APA]. Accordingly, because this Court's power over the parties is grounded in the federal question jurisdiction raised by the State of Montana, Cottonwood's jurisdictional requirement is likewise satisfied.

*Id.*

However, *Freedom* specifically states that the independent jurisdictional grounds requirement only "drops away" when the proposed intervenor is not raising new claims. *Freedom*, 644 F.3d at 844 ("[T]he independent jurisdictional grounds requirement does not apply to proposed intervenors in federal-question cases when the proposed intervenor is ***not raising new claims***.") (emphasis added). In *Freedom*, the proposed intervenor did not assert any counterclaims or cross-claims. *Id.*; *see also*, *Beckman Indus. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992) ("[A]n independent jurisdictional basis is not required because intervenors do not seek to litigate a claim on the merits.") Here, CELC does intend to bring a cross-claim against the defendants. Doc. 15 at 11-13. As such, CELC is required to demonstrate jurisdictional grounds if seeking permissive intervention under F. R. Civ. P. 24(b)(1), and it failed to do so.

2. **CELC's claims and defenses may share a common question of law and fact, but other factors strongly weigh against permissive intervention.**

CELC may have claims and defenses that share a common question of law and fact with the subject matter of Plaintiff's action.[13]  However, "[t]he existence of a common question of law or fact does not automatically entitle an applicant to intervene." *Venegas v. Skaggs*, 867 F.2d 527, 530 (9th Cir. 1989).  The Court has discretion to "'determine the fairest and most efficient method of handling a case….'" *Id.* (quoting *SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1240 (2nd Cir. 1972)).  Given CELC's clear intention to expand the scope of issues in this case (both substantively and through the joinder of USFS and APHIS), the undue delay it intends to pursue (*i.e.* motion to stay), and its overall minimal potential contribution to this case, factors weigh against granting CELC's request.

If a court determines that the initial conditions for permissive intervention under F.R. Civ. P. 24(b) are met, it is "entitled to consider other factors in making its discretionary decision…." *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977).  Relevant discretionary factors include:

---

[13] Plaintiff does not concede that CELC's attempts to broaden the scope of issues in this case, or join new parties, are the "common questions of law and fact" contemplated by the rule.  To the contrary, CELC's affirmative defenses and cross-claim (Doc. 15 at 11-12) and attempts to inject new parties and issues into this case are a departure from the law and facts at issue in this case, namely the legality of **NPS'** actions in promulgating aspects of the BMP.

the nature and extent of the intervenors' interest, their standing to raise relevant legal issues, the legal position they seek to advance, and its probable relation to the merits of the case. The court may also consider whether changes have occurred in the litigation so that intervention that was once denied should be reexamined, whether the intervenors' interests are adequately represented by other parties, whether intervention will prolong or unduly delay the litigation, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.

*Id.*; *see also*, *Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013, 1022 (9th Cir. 2022). Permissive intervention may be denied if discretionary factors counsel strongly against intervention, even when the threshold requirements for permissive intervention have been met. *Callahan v. Brookdale Senior Living Cmtys.*, 2020 U.S. Dist. LEXIS 153378, *14 (C.D. Cal. 2020).

CELC asserts that relevant discretionary factors weigh ***towards*** permissive intervention, arguing 1) that the relationship between the BMP and *CELC* allows CELC to defend the BMP "in a way the federal Defendants cannot," 2) that "[p]ermitting [CELC] to intervene will not prolong or unduly delay this litigation," and 3) that allowing CELC to participate will "contribute to an equitable adjudication of the legal questions presented." Doc. 14 at 17-18.

CELC's actions run contrary to its narrative. CELC has moved to add two federal agencies who did not issue the BMP and who have no discernable relationship to Plaintiff's specific claims. Doc. 16. Plaintiff's case centers on NPS' BMP and violations of law attendant to its promulgation. Plaintiff's case

does not implicate the USFS or APHIS activities CELC cites.  CELC is attempting to interject new issues into this case and expand it beyond the scope of Plaintiff's action.  *Arakaki,* 324 F.3d at 1086; *Akina v. Haw.,* 835 F.3d 1003, 1012 (9th Cir. 2016).

Despite claims that it will "not prolong or unduly delay this litigation," CELC has sought a stay of this case until APHIS and USFS "comply" with the remand order in *CELC* which, on its face, does not require APHIS or USFS to take any specific action. Doc. 18; *CELC* Doc. 253.[14] A quick review of the docket in *CELC* (Case No. 2:18-cv-00012-BMM) would suggest that CELC is trying to co-opt this case as a getaway vehicle should its pending motion to reopen *CELC* be denied.  *CELC* Doc. 278.  Given that CELC's angst towards USFS and APHIS stems from actions those agencies allegedly took outside YNP, it would perhaps be more appropriate and expedient for all if CELC simply initiated suit against those agencies.

While some of CELC's claims and defenses may share a common question of law or fact with this case, discretionary factors weigh heavily against granting them permissive intervention, which is properly denied.

---

[14] Even if the remand order in *CELC* did require APHIS and USFS to engage in their own NEPA analyses, which could take years to complete, its entirely unclear how those decisions would relate to Plaintiff's case.

**C. If this Court Allows CELC's Intervention, Said Intervention Should Be Limited.**

In the event this Court finds CELC's intervention appropriate, Plaintiff respectfully requests that said intervention be limited, so that CELC is precluded from taking actions that unnecessarily expand the scope of this case and cause prejudicial delay.

Restrictions on participation may be placed on an intervenor, even an intervenor of right. *See,* Fed. R. Civ. P. 24 (advisory committee's note on 1966 amendments to rule that "intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings"); *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 13 (D.C.C. 2010) ("Even where intervention is a matter of right, district courts may impose appropriate conditions or restrictions upon the intervenor's participation in the action."); *Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 741-742 (9th Cir. 2011) (The district court's discretion includes discretion to limit permissive intervention to particular issues.). In a complex case, "a district judge's decision on how best to balance the rights of the parties against the need to keep the litigation from becoming unmanageable is entitled to great deference." *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 380 (1987). Proposed intervenors should not be allowed to interject "new, unrelated issues" into pending litigation. *Arakaki*, 324 F.3d at 1086.

Given CELC's simultaneous attempts to reopen *CELC*, clear desire to connect this case with *CELC,* and unabashed attempts to raise issues and join parties in this case that would otherwise remain uninvoked by the Plaintiff, Plaintiff respectfully requests that this Court exercise its discretion to limit CELC's participation.  Plaintiff joins the federal defendants in the scope of limitation they seek in their *Response to the Motions for Intervention* and *Joinder* (*i.e.* that CELC be limited to filing merits briefing in support of any motions for summary judgment filed by the federal defendants).  Doc. 42 at 28.  Plaintiff similarly agrees that the same limitation should be imposed upon Fort Peck Tribes and Conservation Groups to ensure consistency.

## III.    <u>CONCLUSION</u>

CELC's motion seeking intervention should be denied.  CELC fails to fulfill the conjunctive criteria set forth in F. R. Civ. P. 24(a)(2) that would warrant intervention of right.  While CELC may have a claim or defense that shares a common question of law or fact with this case, pursuant to F. R. Civ. P. 24(b)(1)(B), interests of judicial economy, efficiency, equity, and clarity strongly weigh in favor of denying permissive intervention.

Finally, in the event that this Court deems intervention appropriate, Plaintiff respectfully seeks that all intervenor participation be limited to filing merits

briefing in support of any motions for summary judgment filed by federal

defendants.

      RESPECTFULLY SUBMITTED this 12th day of March, 2025.

                 */s/Rachel K. Meredith*

                 Rachel K. Meredith (MSB #11552)

                 Office of the Governor

                 1301 E. 6th Avenue

                 PO Box 200801

                 Helena, MT 59620-0801

                 Phone: 406-444-5503

                 Email: rachel.meredith@mt.gov

                 *Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of L.R. 7.1(d)(2)(A), containing 6,359 words (excluding caption, certificate of compliance, table of contents and authorities, exhibit index, and any certificate of service), as verified by the word count feature of Microsoft Word, the word processor that created it.

_/s/ Rachel K. Meredith_____

Rachel K. Meredith

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was

served on all parties via CM/ECF electronic notice.


*/s/ Rachel K. Meredith*
Rachel K. Meredith